# September Term, 1928

---

### No. 11,891.

### BONFILS, ET AL. *v.* McDONALD, ET AL.

Decided June 25, 1928.   Rehearing denied September 10, 1928.

Mr. JOHN T. BOTTOM, Mr. CASS E. HERRINGTON, for plaintiffs in error.

Messrs. GOODING & MONSON, for defendants in error.

*Department Two.*

Mr. Justice Adams delivered the opinion of the court.

McDonald and Walter, defendants in error, were plaintiffs in the trial court. They brought suit to quiet title to certain coal lands in Routt county, and for damages. Defendants admitted that they had no claim on the property, but opposed the claim for damages. Over defendants' objection, the case was tried to a jury, which resulted in a verdict in the sum of $2,854, for rents or royalties, and in the further sum of $6,397, claimed on account of damages to the premises. This verdict, followed by judgment, was against the plaintiffs in error, Bonfils, individually, and Tammen et al., as executors of the estate of H. H. Tammen, deceased. Defendants bring the case here for review. The parties will be designated as aligned at the trial. Others besides Bonfils and the Tammen executors were parties to the suit in the trial court, but our review is confined solely to the claims of the plaintiffs against the defendants named, they being the only parties to the record in this court.

Briefly stated, the real property involved, as far as this case is concerned, went through nine stages, or periods of time, divided as follows:

First. Ownership and possession by plaintiffs.

Second. September 21, 1914, plaintiffs executed a coal mining lease to one Robert Allen, to run to October 1, 1934, unless previously terminated by plaintiffs for failure of the lessee or his assignees to comply with the terms of the lease. This is plaintiffs' Exhibit A. It called for a royalty of nine cents per ton on all coal to be mined and shipped from the property, and a minimum royalty of $100 per month until January 1, 1916, and thereafter a minimum royalty of $150 per month, whether any coal was mined or not. The lease was expressly made assignable, and provided that "The terms, covenants, conditions and stipulations of this lease shall be obligatory upon and inure to the benefit of the successors, heirs and assigns of the parties hereto."

Third. Thereafter, Allen assigned his interest in the lease to the Allen Coal Company. The latter company took possession, equipped and operated the mine, and, according to plaintiff, continued operations until on or about October 15, 1918.

Fourth. April 14, 1917, during the tenancy of the Allen Coal Company, it assigned the lease to one Craig, as security for the payment of monies to be advanced by Craig to be used in the purchase of equipment, and to develop and operate the mine. It was further provided that if Craig would advance the money as needed, the company would increase its output, and Craig would have an option to purchase 75 per cent. of the entire output at a specified price. The assignment of the lease from the Allen Coal Company to Craig particularly specified that it was security for the payment of the money loaned; this instrument is plaintiffs' Exhibit C, and the seventh clause thereof reads as follows: "The party of the first part agrees to keep its mine and mines in continuous operation unless prevented by general strike, shortage of cars or casualty, to the end that the production of coal shall not be less than an average of seventy-five tons per day for any one month; and in case the party of the first part ceases to operate its mine and mines as aforesaid, without being prevented from so doing by reason of one of the above mentioned causes, then the party of the second part, or his assigns, shall have the privilege of declaring the whole amount of said indebtedness, at the time unpaid, due and payable, having the right, in taking possession of the property under the lease or leases, to operate the mine and mines, paying the royalties, if any are due, from time to time, under the terms of the lease to the original lessor or lessors, without the necessity of bringing any suit in court for the foreclosure of the rights of the party of the first part in the lease and leases."

Fifth. Thereafter, on a date not definitely stated, Craig assigned his claim against the Allen Coal Company,

and his leasehold security and rights under Exhibit C, to Bonfils and Tammen.

Sixth. The Allen Coal Company defaulted in the performance of its obligations to Bonfils and Tammen under Exhibit C, and by reason of such default, the latter, on or about October 15, 1918, took possession of the property, according to the terms of the instrument last mentioned, and operated the mine, on its own account, so plaintiff avers, and performed the conditions, and paid the royalties to plaintiffs under the original lease, plaintiffs' Exhibit A, until on or about October 15, 1919.

During this sixth period, i. e., while Tammen and Bonfils were in possession, the plaintiffs, on December 12, 1918, entered into an independent contract with the Allen Coal Company. This is plaintiffs' Exhibit B, attached to the complaint. It shows that a controversy existed between plaintiffs and the coal company, and that they came to a compromise, by which they modified the terms of the original lease, plaintiffs' Exhibit A, in respect to royalties and tonnage of coal to be mined. Tammen and Bonfils were not recognized in the modified agreement, Exhibit B, and had nothing to do with it.

Seventh. The seventh stage begins on October 15, 1919. Plaintiffs showed that on that date, Tammen, Bonfils, and one McDowell made a contract, Exhibit D, a copy of which is attached to the complaint. This contract, among other things, mentions the two preceding contracts, Exhibits A and C. It recites the compliance on the part of Bonfils and Tammen with their part of the contract, and the failure of the Allen Coal Company to comply with its contract in the delivery of coal as agreed upon; it declares that Bonfils and Tammen have under their contract taken possession of the mine and that there is now due them from the coal company for monies loaned under the contract with other proper charges and interest, the sum of $16,571.14, and there is a balance of 19,250 tons of coal due Bonfils and Tammen to be de-

livered from the mine on the 20,000 tons purchased under the contract.

Under this agreement, Exhibit D, Bonfils and Tammen assigned and sold to McDowell their indebtedness against the Allen Coal Company, and all their securities, including the above lease, the purchase to become final when Tammen and Bonfils had received the amounts due them; McDowell to have the right to take charge of the property and operate the same until the Allen Coal Company was entitled to resume possession thereof. It was further provided in Exhibit D, that the property was to be operated by McDowell, not as agent or employee of Bonfils and Tammen, but as their assignee, and the owner of their rights. The contract also provided that Bonfils and Tammen should turn the property over to McDowell free and clear of any royalty due the owners, and if any royalty is owing they should pay it and charge it against the Allen Coal Company and add it to the indebtedness, but by another subsequent clause it was further provided in substance that all expenses, charges and liabilities after the assignment were to be borne by McDowell. It also provided that the contract, notes and security held by Tammen and Bonfils should be placed in escrow until they were paid in full by McDowell.

We continue the narrative by quoting in part from the eleventh paragraph of plaintiffs' complaint: ''On or about October 15, 1919, or shortly thereafter, the defendant McDowell, under and pursuant to his contract and agreement, exhibit 'D,' held and retained possession of the premises and equipment aforesaid, and operated the property as a coal mine until on or about January 21, 1922, * * * ;''

Eighth. After January 21, 1922, no one was in charge of the property. Resuming our quotation from paragraph eleven of the complaint, which we have separated only to designate the next period of time, it reads: ''And on said date, (January 21, 1922,) the defendant McDowell quit and surrendered the premises aforesaid and

turned the premises and equipment back to defendants Tammen and Bonfils, as plaintiffs are informed and believe, and quit and abandoned the premises and ceased operations under the lease and contract aforesaid.''

Notwithstanding the above allegation that McDowell turned the premises and equipment back to Tammen and Bonfils, there is no proof that they did so, and plaintiffs negative their own allegation to this effect in the fourteenth paragraph of the complaint, which says, among other things: ''At or about the time the said McDowell quit and abandoned the mine and premises, as aforesaid, and from thence on the premises remained deserted and abandoned by the defendants and each of them. No one was kept in charge thereof, no care was taken of the equipment, the mine or the premises. The equipment, machinery, and tools were permitted by the defendants to be removed from the premises; the mine and tunnel caved in, deteriorated, filled up with water and went to ruin and was destroyed and damaged, and the premises, by and on account thereof, have been and are injured, and the plaintiffs have been and are damaged in the sum of $12,500.00.''

Walter, one of the plaintiffs, testified that McDowell complained to him that he (McDowell), ''Had not been able to sell the coal, had been turned down on account of the quality * * * It would not stand storage, was a hard coal to sell in the spring and summer, not possessed of the qualities that would store.'' McDowell paid plaintiffs part of the royalties, but there was a deficit when he quit. Part of plaintiffs' claim and judgment for royalties covers the period of McDowell's occupancy, the remainder is from the date of abandonment to plaintiffs' declaration of forfeiture on October 21, 1922. The claim and judgment for injuries to the mine is alleged to be because of its abandonment, and begins with that date.

Ninth. On or about October 21, 1922, the plaintiffs elected to declare the lease cancelled and forfeited and notified the defendants thereof.

Tammen died on July 19, 1924, and on October 3, 1925, plaintiffs sued Bonfils and others, including the executrix and executors of Tammen's will, whom we have designated for brevity as the Tammen executors.

The complaint contains the usual allegations in a suit to quiet title, and concludes with a prayer to have the title quieted, and for damages and general relief.

From the start, counsel for Bonfils and the Tammen executors have insisted that the complaint does not state facts sufficient to constitute a cause of action. The point was raised in their separate answers, by objection to the introduction of evidence before the witnesses were sworn, by motions for nonsuit, motion for new trial, and now, by the assignment of errors filed in this court. Other facts necessary to an understanding of the case will be stated in the opinion which follows.

1. It will of course be conceded that if there was no contract, express or implied, between plaintiffs and Bonfils and Tammen, or no duty imposed by law that the latter owed plaintiffs, then the alleged breach by such defendants was a breach of nothing, the judgment was erroneous and we need go no further, or pass on any other assignment of error. Counsel for defendants assert, and rightly, that there must be either privity of contract or privity of estate between such parties, in order to justify the judgment. Counsel for plaintiffs agree to this proposition, but say that there was in fact both privity of contract and privity of estate, so that, in either view, they claim the judgment to be well founded.

2. This point of divergence, applied to a matter of large consequence, justifies us, we believe, in resorting to elementary definitions. ''Privity of contract is that connection or relationship which exists between two or more *contracting parties*.'' (The italics are ours.) Black's Law Dic., p. 943; Bouvier's Law Dic. (Rawle's 3d revision), p. 2722. It is claimed by counsel for plaintiffs that there was privity of contract between plaintiffs and Tammen and Bonfils, by virtue of the original lease, from

plaintiffs to Allen, plaintiffs' Exhibit A, but a glance at that instrument shows that neither Tammen nor Bonfils were parties to such agreement; they were total strangers to it when it was executed; they had nothing to do with the coal lease until several years afterward. It is no answer to point to the obligations of the contract, to pay royalty or to perform any other covenant, however drastic or imposing such covenants may be, to establish liability merely by virtue of such agreement, on a third person not a party thereto, and counsel have cited us to no authority to this effect. The authorities are otherwise. "It is essential to the maintenance of an action on any contract that there should subsist a privity between the plaintiff and defendant in respect of the matter sued on." Black, supra, under "Privity," at page 943. This being so, the liability of Bonfils and Tammen, if any, by contract, must be sought for in some contract subsequent to Exhibit A. In determining this, we are further aided by the allegations in the complaint that Bonfils and Tammen, whatever their obligations were, kept and performed them until the execution of the McDowell contract, Exhibit D, which was made on October 15, 1919.

*Wilson v. Lunt*, 11 Colo. App. 56, 52 Pac. 296, is relied upon by counsel for plaintiffs as authority for their claim that there was privity of contract, but the facts there were quite different. There, Lunt, the assignee of the leasehold, in accepting the assignment, did so under an express condition in such assignment, "to pay the owner of said property the rent reserved to be paid under and by virtue of said lease for and during the full term thereof, and to do and perform all things required to be done * * * by the term of said lease. * * * " Lunt was a party to that agreement, and the court stated, on page 59 of the opinion, that it was the controlling circumstance—Lunt made the promise to pay the rent reserved for the term, and accepted the estate on such condition.

334

*McKee's Cash Store v. Otero,* 19 Ariz. 418, 171 Pac. 910, is also relied upon by plaintiffs, but there too there was an express promise, a personal covenant to pay rent, by the maker of the contract, acting for a corporation, the real principal, and it was held liable under the law of agency, but this is a question wholly foreign to the case at bar.

3. If we look to the subsequent exhibits, we find that plaintiffs' Exhibit B, a contract between plaintiffs and the Allen Coal Company, shows that plaintiffs regarded the coal company as the holders of the lease, and the proper party to contract with plaintiffs, even though it is said Bonfils and Tammen were then in possession. The latter were ignored in Exhibit B. Looking further, to Exhibit C, the assignment from the coal company to Craig, and Exhibit D, from Craig to Bonfils and Tammen, they show what they are, and plaintiffs' complaint also shows them to be what they are, namely, assignments as security for the payment of monies advanced and to be advanced in operating the mine.

Tammen and Bonfils succeeded to the rights of Craig, a creditor and purchaser of coal from the Allen Coal Company. They thus became remote assignees of the leasehold, not for the purpose of taking possession and operating it, except in case of default, but only as security. From a contractual standpoint, such was their contract, and later, McDowell succeeded to their rights. If it be said that plaintiffs' consent was necessary for a legal assignment of the debt and security, we need not decide such point, because such consent was given. McDowell attorned to the landlords; they accepted rent from him, agreed to the assignment, and whatever breach occurred, happened after such attornment. Plaintiffs' claim that Bonfils and Tammen were parties to the original lease is thus subject to at least as valid an argument that plaintiffs were also parties to the subsequent agreements, Exhibits C and D, that they were bound by the terms thereof, and that Exhibits A, C and D should there-

fore be construed together, with the limitations imposed by the subsequent contracts, C and D.

The status of Tammen and Bonfils was that of mortgagees of the leasehold, not in possession at the time of default. If this matter should be decided on the theory of privity of contract, under the circumstances of this case it would lead to the defeat of plaintiffs' claim against such defendants, because of the limitations in the security assignments, but we prefer to adhere to the logical precedents that the rights and liabilities of a mortgagee of a leasehold to the owner, are governed by the law of privity of estate, and not of contract.

4. Privity of estate is "The relation which subsists between a landlord and *his tenant.* (The italics are ours.) It is a general rule that a termor cannot transfer the tenancy or privity of estate between himself and his landlord without the latter's consent: an assignee who comes in only in privity of estate is liable only while he continues to be legal assignee; that is, while in possession under the assignment; Bac. Abr. *Covenant* (14); Woodf. Landl. & T. 261; Viner, Abr.; Washb. R. P." Bouvier's Law Dic. (Rawle's 3d. Revision) vol. 3, p. 2722. In *Shaffer v. George,* 64 Colo. 47, 51, 171 Pac. 881, will be found quotations from leading text writers, a part of which we repeat: " 'An assignee of a lease is bound by privity of estate to perform the express covenants which run with the land, but in the absence of express agreement on his part, he is liable only on such covenants as run with the land and only during such time as he holds the term.' "

While Bonfils and Tammen were in possession, there was privity of estate between them and plaintiffs, but when they surrendered it with the latter's consent, such privity ceased.

5. Counsel for plaintiffs cite *Brown v. Hallett,* 68 Colo. 316, 190 Pac. 429 to show that the assignment of a lease does not relieve the lessee from his covenant to pay rent even though rent be accepted from the assignee. By this

they mean that when plaintiffs took payments from McDowell, it did not relieve Bonfils and Tammen. The citation is without application, however, because of the absence in the instant case of the required covenant. The complaint does not allege any, unless it be by virtue of defendants' occupancy as mortgagees under Exhibits C and D after condition broken, but, as above stated, this suit does not cover the period of such occupancy; it covers that of McDowell, and the time subsequent thereto. Between the lessor and lessees, Allen or the Allen Coal Company, there may have been privity of both contract and of estate, and where both exist, privity of estate may be destroyed, and still the privity of contract remain. Bouvier, supra, at page 2722. On the other hand, when there is only privity of estate, it of course cannot be contended that its destruction of necessity creates a privity of contract which did not theretofore exist, but this would be the practical effect if we gave weight to the argument of counsel for plaintiffs.

6. In this state, leases of land for a term of years are regarded as real estate instead of personalty. C. L. § 6517; *McKee v. Howe,* 17 Colo. 538, 541, 31 Pac. 115. The assignment of the leasehold as security to creditors of the lessee was therefore in the nature of a mortgage of real estate. *Johnson v. Sherman,* 15 Cal. 287. Parol evidence, we have held, is admissible to show that a paper purporting to be an absolute assignment, was in fact intended to convey a less estate. *Ver Straten v. Worth,* 79 Colo. 30, 243 Pac. 1104. To same effect, see *Johnson v. Sherman, supra.* The present case is even stronger, because the conditional character of the assignment from Craig to Bonfils and Tammen, and from them to McDowell, appears by the express terms of the instruments pleaded by plaintiffs. Being security only, no absolute estate was conveyed, and strict foreclosure not being allowed in this state, no provision in the mortgage could cut out the Allen Coal Company's equity of redemption. The transaction was indelibly stamped as a mortgage, and

is to be regarded as such. The "term" of the mortgagees was not the twenty-year term of the original lease, as contended by counsel for plaintiffs, subject to the right of plaintiffs to terminate it for breach of condition. The period of the mortgagees' occupancy was the duration of their liability. The lessors were fully aware of the character of the transaction; all of the facts that we have stated are taken either from plaintiffs' pleading or from their evidence. The real point of this case is, is one party to be held for another's breach, and when mortgagees have surrendered possession with the consent of the landlord, are they obliged to re-enter and assume the obligations of the party in default? We hold that they are not, when no reasons are shown why they should do so. As said by the learned Chief Justice Field in the California case cited, *Johnson v. Sherman, supra,* at page 290 of the opinion, "Even if Sherman were liable as assignee upon the covenants of the lease—as he was not, as will hereafter appear—his liability ceased with the assignment." The lucidity of the opinion in *Johnson v. Sherman,* and the wide reputation of the able jurist who wrote it, commends it to further reading. Quotations from it will be found in *McBee v. Sampson,* 66 Fed. 416, 418; *McGurren v. Garrity,* 68 Cal. 566, 9 Pac. 839; *Northwestern Mut. L. Ins. Co. v. Security Savings and Trust Co.,* 261 Fed. 575, 580, and in other cases there cited. The rule is wholly in keeping with our previous decisions, and we approve of it.

7. Whatever merit plaintiffs' evidence had was clouded by their counsel's seeming diffidence in bringing out all of the facts, and their production of evidence, as might be said, somewhat on the cafeteria plan, that is, the selection of only such dishes as were suitable to their tastes, or favorable to their theory of the case, and the refusal of the unpalatable. In this way, they were successful, over the objections of counsel for defendants, in keeping from the jury the consideration of everything relating to the really controlling feature, defendants' position as mort-

gagees, although plaintiffs themselves had shown it in their pleadings. It even went so far as to get into the evidence parts only of correspondence, and the keeping out of another letter, part of the same correspondence, later offered by defendants, rationally explaining the meaning of the writings, like a letter from one Levand, written on behalf of Tammen and Bonfils, and acknowledging that Tammen and Bonfils held a lease. This letter was admitted over defendants' objection because the previous correspondence was not offered. The objection was overruled, and when defendants later offered the previous letter, which answered the one admitted, and which showed that the correspondents fully understood and expressly referred to the mortgage or security character of defendants' holdings, defendants' offer was refused. As a result, plaintiffs were unembarrassed by the first letter. The correspondence as thus disjointed, conveyed about as much complete thought as an unfinished sentence. Such gaps justify us in declining to attempt to decipher the meaning of writings, on behalf of the litigants responsible, when no reasonable explanation is offered for the piecemeal and incomplete character of the evidence.

8. As a consequence of the above method of producing testimony, important information was withheld from the jury, and a wholly imperfect picture was presented to their view. It is elementary that a party cannot pick out the most favorable parts of correspondence for his evidence, and withhold the unfavorable. At that, we find nothing in such evidence inconsistent with plaintiffs' admissions of performance by defendants during the period for which they were liable.

In fairness to the honorable trial court, we owe it to say that there is nothing whatever in the record to indicate bias or prejudice on the part of the learned trial judge, toward one side or the other. The evidence was rejected only because the court did not believe it tended to prove any material issue, or had any bearing on it,

but in this we are obliged to disagree with such rulings. . .
Plaintiffs' theory of the case is untenable.

9. The fallacy of plaintiffs' position can be tested by
its results. If the mere assignment of an instrument as
security should visit on the mortgagee all of the obliga-
tions of the assignor, securities would in untold instances
be liabilities instead of assets. It was no exaggeration
when the court said in *Northwestern Mut. L. Ins. Co. v.
Security Co., supra,* that "The consequences would be
terrible." We doubt if there is a bank in the country
that would not be injuriously affected by such an inno-
vation.

10. Counsel for defendants Bonfils and the Tammen
executors have assigned many other alleged errors in
the record, but the matters we have stated are our rea-
sons for concluding that such defendants' motions for
nonsuit should have been sustained. The judgment is
accordingly reversed with directions to quiet title in
plaintiffs, and to set aside the money judgment against
Bonfils and the Tammen executors.

MR. CHIEF JUSTICE DENISON, MR. JUSTICE BUTLER and
MR. JUSTICE CAMPBELL concur.