**FIRST NATIONAL BANK OF WINDSOR, Plaintiff–Appellee,**

**v.**

**GILBERT MARSHALL & COMPANY, Defendant–Appellant.**

**No. 88CA0930.**

Colorado Court of Appeals, Div. V.

Aug. 31, 1989.

Daniel W. Dean, Ft. Collins, for plaintiff-appellee.

Wood, Herzog, Osborn & Bloom, P.C., J.J. Vick, Ft. Collins, for defendant-appellant.

METZGER, Judge.

In this action concerning the disbursement of proceeds from the sale of securities, defendant, Gilbert Marshall & Company (broker), appeals the money judgment entered in favor of plaintiff, First National Bank of Windsor (bank). We affirm.

Robert Warren was indebted to the bank for sums in excess of $240,000, represented by several promissory notes. Collateral for these notes consisted of shares of stock in Warren's name, which were held by the bank.

On February 21, 1986, Warren opened an account with the broker but did not fund it. However, he instructed the broker to send copies of all trade slips and monthly account statements to the bank. A few days later, in a meeting with his loan officer at the bank, he asked that he be allowed to sell the pledged stock and reinvest in more favorable stock or apply the sale proceeds to his loan. The loan officer agreed to release the pledged stock for sale, with the promise that the bank receive any funds realized or, if new stock were purchased, that the certificates be delivered to the bank to hold as collateral for Warren's loan.

Then, on February 26, 1986, the bank mailed the stock certificates, accompanied by executed stock transfer powers, to the broker. The transmittal letter instructed

the broker as follows: "If sold please forward proceeds or if other stock is purchased send certificates to the First National Bank of Windsor."

Despite the provisions of this letter, Warren directed one of the broker's employees to sell all the stock and place the proceeds into his brokerage account. When that employee inquired of Warren concerning the bank's contrary instructions, he told her "not to worry, this had been resolved," and repeated his instruction to put the proceeds into his account. The bank was not contacted.

Thereafter, the stock was sold, the proceeds were placed in Warren's account, and were withdrawn by him. He later declared bankruptcy.

When the bank received its copy of the trade confirmation and demanded that the broker send it the proceeds, the broker refused, noting that it had followed the instructions of Warren, its account-holder, and had transmitted the proceeds to him. This lawsuit followed, and after a trial to the court, judgment was entered in favor of the bank.

I.

The broker initially contends that the trial court's finding of privity between the bank and the broker was unsupported by the evidence. We disagree.

■ Privity is that connection or relationship which exists between two or more contracting parties. *Bonfils v. McDonald*, 84 Colo. 325, 270 P. 650 (1928).

Under the Uniform Commercial Code, a contract for the sale of securities is not enforceable unless:

"Delivery of a certificated security or transfer instruction has been accepted ... but the contract is enforceable under this provision only to the extent of the delivery, registration, or payment...." Section 4–8–319(b), C.R.S. (1988 Cum. Supp.).

"Delivery with respect to ... certificated securities means voluntary transfer of possession." Section 4–1–201(14), C.R.S. (1988 Cum.Supp.).

■ Here, the broker accepted delivery of the securities from the bank, but the delivery was conditional, since the bank had specifically instructed the broker concerning the disposition of the proceeds. By its acceptance and sale of the certificates, the broker accepted the conditions of the delivery. These actions by the broker created a contract between the broker and the bank, and thus, privity between the bank and the broker existed.

Although the evidence is conflicting whether the bank mailed the stock certificates or whether Warren personally delivered them, there is support in the record for the trial court's ruling on this issue. Therefore, we will not disturb it. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

II.

Section 4–8–318, C.R.S. (1988 Cum.Supp.) provides:

"An agent or bailee who in good faith (including observance of reasonable commercial standards if he is in the business of buying, selling, or otherwise dealing with securities) has received certificated securities and sold, pledged, or delivered them, or has sold or caused the transfer or pledge of uncertified securities over which he had control, according to the instructions of his principal is not liable for conversion or for participation in breach of fiduciary duty, although the principal had no right so to deal with the securities."

The broker relies on that section to support its contention that the trial court erred in finding that it breached its duty to follow common and ordinary business practices by disbursing the proceeds to Warren before inquiring of the bank concerning its restricted delivery of the stock certificates. In our view, the broker's reliance is misplaced.

■ "Good faith" means honesty in fact in the conduct or transaction concerned. Section 4–1–201(19), C.R.S. The exercise of due diligence to learn the essential facts relative to the customer, his account, and sale orders formulate what are

"reasonable commercial standards" within the meaning of the code. *Hartford Accident & Indemnity Co. v. Walston & Co.*, 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967). Actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith. *United States Fidelity & Guaranty Co. v. Royal National Bank*, 545 F.2d 1330 (2d Cir.1976).

■ The broker received the letter, accompanied by stock certificates and stock powers from the bank. Although the stock certificates were in Warren's name, the stock powers signed by Warren authorized the bank to sell the stock. Thus, the language of the letter and the stock powers, construed together, constituted notice to the broker of the bank's adverse claim to Warren's ownership of the stock certificates. Moreover, at trial, the broker conceded that it should have contacted the bank to resolve the conflict between the instructions contained in the letter and those voiced to its employee by Warren. Therefore, since the record supports the trial court's finding that the broker failed to observe commercially reasonable standards in its sale of the securities, the determination that the broker failed to prove the good faith defense contained in § 4–8–318 was correct.

### III.

The broker finally contends that the trial court erred in ruling that it failed to meet its burden of proof as to the affirmative defense of mitigation of damages. Again, we disagree.

■ A party injured by breach of a contract has a duty to make a reasonable effort to reduce the damage sustained. *Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo.1985). Failure to mitigate damages is an affirmative defense which defendant has the burden of establishing. *Combined Communications Corp. v. Bedford Motors, Inc.*, 702 P.2d 281 (Colo.App.1985). Absent a clear abuse of discretion, the trial court's determination with respect to damages will not be disturbed on review. *Leo*

*Payne Pontiac, Inc. v. Ratliff*, 178 Colo. 361, 497 P.2d 997 (1972).

■ After the bank sent the stock certificates, it received a receipt for their transmittal and, a few days later, received confirmation slips from the sale of the stock. The confirmation slips were consistent with the terms of the transmittal letter. Several weeks later, when the bank received a copy of Warren's brokerage account statement indicating that the proceeds of the sale had been disbursed directly to him, it immediately contacted both the broker and Warren. When there was no resolution, the bank initiated this action.

The trial court determined that these facts "suggested nothing that [the bank] could have done to have changed [its] loss as a result of [the broker's] conduct." Since the record amply supports this determination, no abuse of discretion occurred. *Page v. Clark, supra.*

Judgment affirmed.

REED and RULAND, JJ., concur.