F. Cleveland TRIMBLE, Petitioner,

v.

The CITY AND COUNTY OF DENVER, a municipal corporation, and Abraham J. Kauvar, Respondents.

No. 81SC398.

Supreme Court of Colorado, En Banc.

March 11, 1985.

Rehearings Denied April 15, 1985.

718

Holme Roberts & Owen, Daniel S. Hoffman, McDermott, Hansen, Anderson & Reilly, Daniel M. Reilly, Denver, for petitioner.

Max P. Zall, City Atty., Robert M. Kelly, John L. Stoffel, Jr., Brian H. Goral, Asst. City Attys., Denver, for respondents City and County of Denver and Abraham J. Kauvar, in his capacity as Manager of Health and Hospitals.

Holland & Hart, William C. McClearn, Bruce W. Sattler, John C. Tredennick, Jr., Denver, for respondent Abraham J. Kauvar.

LOHR, Justice.

Dr. F. Cleveland Trimble, the former director of the Department of Emergency Medical Services (Emergency Medical Services) at Denver General Hospital brought suit against the City and County of Denver (City) and Trimble's immediate supervisor, Dr. Abraham J. Kauvar, manager of Denver's Department of Health and Hospitals (Health and Hospitals). Trimble's complaint stated a breach of contract claim against the City and claims for tortious conduct against Kauvar, all arising from the termination of Trimble's employment with Denver General Hospital. After a trial without a jury, the Denver District Court awarded Trimble compensatory and punitive damages against Kauvar, and compensatory damages against the City. The Colorado Court of Appeals affirmed part of the award against the City, and reversed the remainder of the judgment. *Trimble v. City & County of Denver,* 645 P.2d 279 (Colo.App.1981). We granted certiorari to review this decision.

We conclude that the court of appeals correctly determined the extent of the City's liability. Parts of the trial court's judgment against Kauvar, however, were proper and should have been sustained. Therefore, we affirm the judgment of the court of appeals in part, reverse it in part, and remand the case for further proceedings.

## I.

The trial court made extensive findings detailing the relevant facts. It summarized the case as follows:

We are in Court on this matter because two very respected physicians clashed over philosophical differences as to how emergency services and ambulatory care should be administered at Denver General Hospital.... [B]ecause of their philosophical differences Dr. Kauvar decided to "get rid" of Dr. Trimble who, he believed, was not cooperating with his policies. In this case, the process and method of getting rid of Dr. Trimble was an abuse of administrative power. He had other authorized alternatives to correct the problem if he believed Dr. Trimble was mutinous or obstructive but he chose an unauthorized and improper method which resulted in the medical and academic community believing Dr. Trimble was "fired", thus damaging the reputation of Dr. Trimble. Also, in exchange for an agreement that Dr. Trimble would resign, give up the right to a career service hearing, and not sue the City or its employees, Dr. Kauvar and the City entered into a settlement contract with Dr. Trimble which the defendants did not thereafter honor, further damaging Dr. Trimble.

Trimble was appointed director of Emergency Medical Services at Denver General Hospital in 1972. This was a classified, permanent career service position. Kauvar was appointed manager of Health and Hospitals by the mayor in February 1974. He was Trimble's supervisor.

When Kauvar assumed his post, Emergency Medical Services was experiencing delays in ambulance service, shortages of personnel and equipment, and patient contacts at four times the designed capacity of the emergency facilities. The trial court found that Kauvar was not responsible for the resource problems that existed in Emergency Medical Services in 1974.

Differences of opinion between Kauvar and Trimble concerning hospital administrative policy surfaced almost immediately. Trimble threatened on several occasions to resign unless he were given more resources to improve emergency patient care. These threats irritated Kauvar. In order to provide faster service and reduce patient loads at Emergency Medical Services, Trimble began to divert ambulances to other hospitals. Kauvar opposed diversion of ambulances because this practice entailed loss of revenue. The differences between the two men intensified. In April 1974, Kauvar demanded Trimble's resignation, but Trimble refused. In May, Kauvar proposed splitting Emergency Medical Services into a critical care unit, which would care for unscheduled patients requiring emergency treatment, and a receiving unit, which would serve unscheduled patients less seriously injured or ill. Trimble was to remain overall chief as well as head of critical care. Trimble opposed this reorganization. The trial court found that, as a result of these disputes, Kauvar developed a personal hostility toward Trimble and began to explore ways of removing him.

Late in June 1974, Kauvar announced the split of the receiving unit and the critical care unit. On July 3, Kauvar ordered Trimble to stop all ambulance diversions to other hospitals. On July 5, the Denver Post published an article reporting Trimble's disagreement with the reorganization of Emergency Medical Services. Kauvar was very upset by the newspaper report.

On July 8, 1974, Kauvar removed Trimble from his position as director of Emergency Medical Services and reassigned him to the Department of Surgery as a staff surgeon. Kauvar testified that he had determined that the transfer was permissible based upon the advice of the Career Service Authority. The trial court found that he had received no such advice, and that the reassignment was made with intentional and reckless disregard for career service rules. Although Kauvar described the reassignment as temporary, he immediately authorized formation of a search committee to look for a permanent successor to Trimble as director of Emergency Medical Services. The trial court found that Kauvar

intended the reassignment to be permanent and that his actions in that regard "were not in good faith and were attended by circumstances of malice toward Dr. Trimble, to 'get rid' of him." Trimble, however, did not elect to leave Denver General Hospital.

In August, Kauvar officially abolished Emergency Medical Services as a separate department, thus eliminating the director's position. The critical care unit was transferred to the Department of Surgery, and the receiving unit became part of the Department of Medicine. The trial court found that the primary purpose of this reorganization was to effect Trimble's permanent removal from the emergency services area. The court specifically determined that the action was attended by malice toward Trimble and was not taken in good faith for bona fide organizational purposes.

In response to elimination of his position as director, and pursuant to career service rules, Trimble chose demotion rather than layoff. He was demoted to the position of associate director of the Department of Surgery. However, the former associate director continued to perform the duties of that office, while, as the trial court found, "Trimble was given an office in a maintenance building, known as the 'boiler house' and was not allowed to perform the duties of the Associate Director. Further, he was assigned to proctology, not his specialty by choice." Unbeknownst to Trimble, Kauvar had agreed with the director of the Department of Surgery that Trimble would never perform the duties of associate director of that department.

Trimble filed a grievance to challenge the validity of Kauvar's actions under career service rules, but in lieu of pursuing that relief to conclusion he entered into a settlement agreement with the City in December 1974, intended, as the trial court found, to restore his reputation. Trimble was to serve as a consultant in emergency medi-

cine, including the instruction of emergency medical services [1] staff and the provision of patient care, for not less than fifteen hours a week over the course of one year. In return, Trimble withdrew the grievance, resigned as a career service employee, and covenanted not to sue the City or its employees "relat[ing] to [his] previous employment at the City's Department of Health and Hospitals or the business and operation of the said Department...." However, Kauvar had determined before the agreement was executed that Trimble was not to be allowed to teach or provide patient care under the contract or to work in the emergency medical services area of the hospital, and Kauvar adhered to that decision.

Kauvar gave Trimble no work assignments until March 1975, when Trimble complained to Kauvar about the lack of work. Kauvar then assigned Trimble to write reports that did not require Trimble's presence on the hospital premises. After making contract payments to Trimble during the initial months of the contract period, the city auditor refused to authorize such payments for April and May. On June 2, 1975, Trimble elected to treat the contract as "discharged."

After his resignation, Trimble worked as a consultant for a private hospital in Denver and then accepted a position as a professor at the University of Florida in 1978. The discontinuation of his employment by the City had led to the termination of his assistant professorship at the University of Colorado and of his candidacy for an associate professorship there. The trial court found that there was a very significant negative reaction to Trimble among his peers following his separation from Denver General Hospital. His extensive professional affiliations and his opportunities to publish reports and make speeches were severely reduced. The court found that:

> Dr. Trimble has suffered a serious and permanent loss of reputation and oppor-

---

**1.** Even though Emergency Medical Services had been technically abolished, leaving a critical care unit and a separate receiving unit, the parties continued to refer to critical care as emergency medical services.

tunity to gain employment in prestigious academic environments. The medical and academic community believes Dr. Trimble was 'fired' by Dr. Kauvar....

....

As a result ... Dr. Trimble has suffered a permanent and substantial loss of ability to enjoy life.

On September 2, 1975, Trimble brought the present action, seeking damages from Kauvar for tortious conduct and from the City for breach of contract. The case was tried to the court without a jury.

The trial court ruled that Kauvar's actions constituted malicious interference with Trimble's contractual rights as a career service employee and under the settlement agreement. The court also concluded that Kauvar had committed fraud, based upon his intentions not to allow Trimble to perform as associate director of the Department of Surgery or to provide the intended services under the settlement agreement, and upon his conduct in furtherance of those intentions. In addition, the court ruled that Kauvar had committed the tort of intentional abuse of administrative power. The City was held to have breached the settlement agreement materially by preventing Trimble's performance and failing to make required payments. The trial court assessed against the City $14,062.50 in damages for monetary losses resulting from breach of the settlement agreement and $35,000 additional contractual damages for Trimble's loss of ability to enjoy life, a form of mental suffering. It also held Kauvar liable for these same amounts based upon his tortious conduct. As further remedies for Kauvar's torts, the court assessed against Kauvar alone $15,000 compensatory damages for Trimble's loss of reputation and $20,000 in punitive damages.

The Colorado Court of Appeals affirmed only the $14,062.50 award against the City

for breach of contract. It held that Trimble had affirmed the settlement agreement and was bound by its covenant not to sue for earlier wrongs, that mental suffering as a result of breach of the settlement agreement was not compensable, that "for purposes of the tort [of intentional interference with contract] Kauvar was a party to the settlement contract and therefore could not be said to have interfered with it, and that Kauvar was not jointly liable for breach of that contract." [2]

Four issues are raised on certiorari review: (1) Does Trimble's covenant not to sue bar all actions by him other than those based on the settlement agreement? (2) Could Kauvar, as an employee of the City, be liable for intentional interference with the contract relationship between Trimble and the City? (3) Does Kauvar enjoy official immunity for his actions? (4) Can Trimble recover against either defendant for mental suffering? We consider these questions in turn.

II.

Trimble signed a settlement agreement effective on December 17, 1974, which provided that:

Dr. Trimble shall hereafter refrain from filing any civil action in any court or from filing any grievance or similar action before any professional organization or society or from filing any other legal or administrative action against the City and County of Denver, its Department of Health and Hospitals, or its employees insofar as any such filing or action relates to Dr. Trimble's previous employment at the City's Department of Health and Hospitals or the business and operation of the said Department and shall refrain from further processing his pending Career Service Authority appeal and grievance and shall enter into a stipula-

---

**2.** The court of appeals misconstrued the trial court's judgment as including assessment of damages against Kauvar for breach of the settlement agreement. Although the trial court determined that Kauvar was liable for Trimble's $14,062.50 monetary loss as well as $35,000 for

mental suffering—the same amounts awarded against the City for breach of the settlement contract—the judgment against Kauvar in those amounts was based on tort. The court of appeals also noted incorrectly that Trimble asserted tortious conduct on the part of the City.

tion dismissing said appeal and grievance with prejudice at the request of the Manager of the Department of Health and Hospitals of the City.

Kauvar asserts that this covenant not to sue bars all actions except on breach of the settlement agreement.

█ Public policy favors settlements of disputes, provided the settlements are fairly reached. *Davis v. Flatiron Materials Co.*, 182 Colo. 65, 511 P.2d 28 (1973). The trial court ruled, however, that Kauvar could not employ the covenant not to sue as a defense because of his fraudulent intent with respect to the settlement agreement. He never intended to allow Trimble to teach or to provide patient care in emergency medical services.

█ In effect, the trial court rescinded the covenant not to sue with respect to Kauvar as a remedy for Kauvar's fraud. Trimble contracted with the City for the pecuniary and career benefits of part-time teaching and practice for one year in emergency medical services in return for his resignation and his covenant not to sue. Trimble promised not to sue Kauvar and other city employees concerning his previous employment or the operation of Health and Hospitals. Thus, Kauvar is a third-party beneficiary of the covenant not to sue, and could raise that covenant as defense in this action. *Hyzak v. Greybar*, 36 Colo.App. 164, 537 P.2d 1089 (1975). Denying Kauvar this defense effected a partial rescission of the settlement agreement.

█ Although, as discussed later in this opinion, Kauvar's intention not to honor the settlement agreement constituted fraud, partial rescission of the agreement is not a proper remedy for that misconduct. *See Gibraltar Colorado Life Co. v. Brink*, 113 Colo. 304, 157 P.2d 134 (1945). One seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made, or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented.

*Aaberg v. H.A. Harman Co.*, 144 Colo. 579, 358 P.2d 601 (1960); *Holscher v. Ferry*, 131 Colo. 190, 280 P.2d 655 (1955). The choice of remedies belongs to the one defrauded. *Altergott v. Yeager*, 37 Colo.App. 23, 543 P.2d 1293 (1975). Election is necessary whenever the theories of recovery are inconsistent. *Holscher v. Ferry*.

█ It is clear from the pleadings, the course of the trial and the trial court judgment that Trimble has elected to affirm the settlement agreement and to seek recovery for breach of the agreement by the City. In addition, he seeks damages in tort for Kauvar's fraud in causing him to enter into the contract. Both of these claims are based on a consistent theory, affirmance of the contract. *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964); *Altergott v. Yeager*. Having affirmed the settlement contract, Trimble may not also avoid the burdens of that contract, including his promise not to sue Kauvar regarding Trimble's pre-settlement employment. A remedy based on affirmance of the contract is inconsistent with a remedy, arising out of the same facts, based on disaffirmance and rescission. *Holscher v. Ferry*, 131 Colo. 190, 280 P.2d 655 (1955). When Trimble elected to affirm the contract, he abandoned his right to rescind it in whole or in part. *Id.* Hence the covenant not to sue remains enforceable.

█ Trimble argues that, if election of remedies is required, a tortfeasor incurs no risk by fraudulently attempting to induce a settlement agreement with a victim. That is, affirmance will leave the tortfeasor with the agreement sought, and disaffirmance will place that wrongdoer in no worse position than before the fraud was committed. Trimble's argument fails, however, because the defrauded party has an additional remedy in such a case. The victim who elects to affirm the contract is not limited to the remedy of seeking damages for any subsequent breach. In addition, and fully consistent with affirmation of the agreement, the defrauded party may bring a tort action against the one guilty of fraud to

obtain damages resulting from the fraudulent misrepresentations. *Carpenter v. Donohoe,* 154 Colo. at 82, 388 P.2d at 401; *Altergott,* 37 Colo.App. at 28, 543 P.2d at 1297–98. The defrauded party may recover such damages as are a natural and proximate consequence of the fraud. *Russell v. First American Mortgage Co.,* 39 Colo. App. 360, 565 P.2d 972 (1977). Of course, the victim may instead elect to rescind the contract and be limited in remedy to restoration of conditions existing before the agreement was made. *Neiheisel v. Malone,* 150 Colo. 586, 375 P.2d 197 (1962); *Holscher v. Ferry,* 131 Colo. 190, 280 P.2d 655 (1955). If the victim chooses to affirm the contract, it is not necessary to release him from his contractual obligations—at least as they relate to matters of which he had knowledge when the contract was made—in order to compensate him fully and to deter the tortfeasor. Thus, because of the covenant not to sue, Trimble cannot recover for the so-called pre-settlement torts—those allegedly arising from Trimble's "temporary" reassignment to the Department of Surgery, the abolition of his post as director of Emergency Medical Services, and his subsequent demotion.

▆▆▆ We recognize that in *McKay v. Fleming,* 66 Colo. 258, 180 P. 747 (1919), we held that an action for fraudulent inducement to enter a contract is inconsistent with an action for breach of contract. Certainly, it would not be permissible to allow double recovery of the same elements of damage through such independent actions. The court of appeals' decision in *Altergott,* 37 Colo.App. 23, 543 P.2d 1293, however, illustrates that double recovery is not inherent in an action for fraudulent inducement coupled with a theory of contract affirmance. *Accord Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964). To allow recovery in fraud to the extent that the value of the contractual benefits conferred fell short of the value fraudulently represented, plus any other damages naturally and proximately caused by the fraud, does not doubly compensate the victim and

is fully consistent with affirmance of the contract. Therefore, to the extent that *McKay v. Fleming* holds that an action for fraudulent inducement is necessarily inconsistent with an action for breach of contract we overrule it.

Trimble argues that even if recovery on the pre-settlement torts is barred by the covenant not to sue, there remain two torts that fall outside the scope of that covenant. They are Kauvar's fraudulent inducement of the settlement contract and his malicious interference with the City's performance under that agreement. We discuss these in sequence.

The elements of fraud are:

(1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed. (2) Knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose. (3) Ignorance on the part of the one to whom representations are made or from whom such fact is concealed, [of] the falsity of the representation or of the existence of the fact concealed. (4) The representation or concealment made or practiced with the intention that it shall be acted upon. (5) Action on the representation or concealment resulting in damage.

*Bemel Associates, Inc. v. Brown,* 164 Colo. 414, 418, 435 P.2d 407, 409 (1967), *quoting Morrison v. Goodspeed,* 100 Colo. 470, 477–78, 68 P.2d 458, 462 (1937).

▆▆▆ The trial court found that even at the time the settlement agreement was made Kauvar had no intention of abiding by it. The court found this was a false representation of fact constituting fraud. Kauvar does not dispute in this appeal that this was a misrepresentation [3] of an exist-

---

**3.** It is not clear from the trial court's order whether this fact was found to be misrepresen-

ing material fact. *See Stalos v. Booras,* 34 Colo.App. 252, 528 P.2d 254 (1974). It is apparent from the trial court's findings that Kauvar knew of the falsity of the representation, that Trimble did not, and that the representation was intended to induce execution of the settlement agreement. The covenant not to sue was agreed to by Trimble in reliance on the fraudulent representation, resulting in damage to Trimble. Hence the elements of fraud were proven.

■ Kauvar disputes Trimble's assertion that fraud in the inducement of the settlement agreement falls outside the scope of the covenant not to sue. He reasons that because any misrepresentations or concealment inducing the agreement took place before the agreement was executed, they must be within the ambit of the covenant not to sue. This represents an unduly broad construction of the covenant. Trimble promised not to file any action relating to his *previous* employment or the business and operation of Health and Hospitals, whereas the action for fraudulent inducement relates to what was, at the time, his *future* employment as provided in the terms of the settlement agreement. To view the matter in another focus, proof of damages is an element of fraud, and Trimble was not damaged by Kauvar's misrepresentation of his present intent until he was prevented from providing the part-time services contemplated by the settlement agreement. His action for fraud did not accrue until after execution, so his covenant cannot reasonably be construed to extend to such an action, especially as it is based in essential part on Kauvar's intentional post-execution conduct. *Cf. Rosen v. LTV Recreational Development, Inc.,* 569 F.2d 1117 (10th Cir.1978) (contracts waiving liability for future negligent conduct will be carefully scrutinized).

■ With regard to malicious interference with contractual relations, the second tort alleged by Trimble to be outside the

ted or concealed. It will be assumed that this fact was misrepresented, but the distinction

scope of the covenant not to sue, we agree that this tort, if proven by Trimble, would not relate to his previous employment or the business and operation of Health and Hospitals as those terms are used in the covenant. Therefore, the covenant not to sue does not preclude Trimble from asserting that tort claim.

### III.

■ In further defense against the malicious interference tort, Kauvar contends that even if his alleged interference with contractual relations between Trimble and the City under the settlement agreement does not fall within the scope of the covenant not to sue, his actions were nevertheless privileged because the City was a party to the contract and, Kauvar claims, he was acting within the scope of his employment by the City. In other words, he posits that an agent of an organization is not liable for interference with the contractual relations between that organization and third parties. We hold that the fact that the alleged tortfeasor was an employee of one of the contracting parties is simply one factor, albeit an important one, in determining whether that person acted "improperly," as required to establish an essential element of the tort of intentional interference with contract relations.

■ The existence of a contract may impose a duty on nonparties not to interfere with the performance of that contract. *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207 (Colo.1984); *Watson v. Settlemeyer,* 150 Colo. 326, 372 P.2d 453 (1962). *Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 274 P. 932 (1929). Violation of this duty, causing injury, is the tort of intentional interference with contractual relations. In *Memorial Gardens* we cited with approval the following definition of the tort as set forth in Restatement (Second) of Torts § 766 (1979):

does not affect the analysis.

One who *intentionally* and *improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

690 P.2d at 210 (emphasis added in *Memorial Gardens* ). *See Comtrol, Inc. v. Mountain States Telephone & Telegraph Co.*, 32 Colo.App. 384, 513 P.2d 1082 (1973).

█ Kauvar asserts that the City was not a "third person" with respect to him. Kauvar and the City were obviously not alter egos, a relationship which would preclude characterizing the City as a third person. *See Gude v. City of Lakewood,* 636 P.2d 691 (Colo.1981). Kauvar's relationship to the City was that of employee to employer or agent to principal. *See Shriver v. Carter*, 651 P.2d 436 (Colo.App. 1982); *Electrolux Corp. v. Lawson*, 654 P.2d 340 (Colo.App.1982). An employer may sue an employee for tortious interference with contractual relations between the employer and other persons. *Electrolux Corp. v. Lawson.* The City, therefore, was indeed a third person with respect to Kauvar.

█ Nevertheless, Kauvar is not liable in tort for his interference with the performance of the settlement agreement between Trimble and the City unless Kauvar acted "improperly." *Memorial Gardens,* 690 P.2d 207, 210; Restatement (Second) of Torts § 766 (1979).

In determining whether an actor's conduct in intentionally interfering with a contract ... of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979). *See Memorial Gardens,* 690 P.2d 207, 210 n. 7.

█ Although it is important that "freedom of action [of corporate officers] directed toward corporate purposes should not be curtailed by fear of personal liability," *Steranko v. Inforex, Inc.*, 5 Mass.App. 253, 273, 362 N.E.2d 222, 235 (1977), even an agent can be liable for improper interference with the principal's contractual relations, *see Credit Investment & Loan Co. v. Guarantee Bank & Trust Co.*, 143 Colo. 393, 353 P.2d 1098 (1960). If the actor is motivated solely by a desire to harm one of the contracting parties or to interfere in the contractual relations between those parties, the interference is certainly improper. Restatement (Second) of Torts § 767, comment d (1977); W. Prosser, *The Law of Torts*, 943–44 (4th ed. 1971). *Cf. Steranko*, 362 N.E.2d 222, 235–36 (analyzing the matter in terms of corporate officers' qualified privilege, lost when conduct is motivated by malice).

The trial court found that when the settlement agreement was executed Kauvar had already determined that Trimble would not be allowed to render any services in the emergency medical services area at Denver General Hospital and would not be permitted to teach or to provide patient care. The trial court specifically concluded that Kauvar's actions and intentions constituted malicious interference with the contractual relationship between Trimble and the City, and an abuse of administrative authority.

The abuse of administrative authority ruling implies that Kauvar was not acting for bona fide organizational purposes in interfering with the contract between Trimble and the City. This, in conjunction with the finding of malice, leads to the conclusion that Kauvar's actions were unjustified and improper. With the other elements of

the tort of intentional interference with contractual relations established, we hold that the trial court correctly based judgment against Kauvar on this claim.

## IV.

Kauvar asserts, however, that he enjoys official immunity against all of Trimble's claims by virtue of his role as manager of Health and Hospitals. Proper evaluation of this contention requires some discussion of the evolution of the principles of official immunity in Colorado law.

The doctrine of official immunity is grounded in common law. *Kristensen v. Jones*, 195 Colo. 122, 575 P.2d 854 (1978). The rationale for the doctrine was cogently stated by Judge Learned Hand in *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so

often the case, the answer must be found in a balance between the evils inevitable in either alternative.

From the turn of the century to 1960, Colorado courts balanced the evils in the same way that Judge Hand did, by conferring absolute immunity upon officials. In *Miller v. Ouray Electric Light & Power Co.*, 18 Colo.App. 131, 70 P. 447 (1902), a mother sued the county commissioners of Ouray County personally for her son's death by suffocation during a fire in the county jail. Alleged liability was based upon breach of the commissioners' statutory duty to examine the county jail personally and to correct all irregularities found. The original Court of Appeals of Colorado affirmed dismissal of the charges against the county commissioners, stating:

> If the contention of plaintiff be the law, then each individual commissioner would be liable in like actions to this, because of damages suffered by an individual by reason of alleged defects in a public highway or in a county bridge, or in any public building, or in the public grounds in which it might be situate. To so hold would tend in the large counties of the state, at least, to bring about, as was said by the supreme court of Idaho, "the literal abrogation of the office of county commissioner, for no sane man would assume the position with such a liability attached." (Citation omitted).

*Id.* at 138–39, 70 P. at 449. Subsequent cases in this first period reiterated the principle that public officials were not personally liable for breaches of duty to the public, bolstering the idea of official immunity with the notion that public officials owed a duty only to the public as a whole, and therefore could not be held liable for individual injury. *Richardson v. Belknap*, 73 Colo. 52, 213 P. 335 (1923) (no personal liability for county commissioners' failure to maintain railings on bridge); *People ex rel. Lamar Publishing Co. v. Hoag*, 54 Colo. 542, 131 P. 400 (1913) (no personal liability for county clerk's failure to publish nominations list).

The doctrine of absolute immunity was abrogated in 1960, when this court held that the county commissioners of Ouray County were personally liable for torts that they committed. *Liber v. Flor,* 143 Colo. 205, 353 P.2d 590 (1960). We reversed dismissal of the action against the commissioners brought by a plaintiff who suffered injury as a result of negligence in the storing of explosives near a highway. This court stated, "[f]rom all that appears on the face of the complaint the individual defendants were the actual tort-feasors, and if the evidence establishes this fact as to any one or more of them, they should be held liable in all respects as other tort-feasors." *Id.* 143 Colo. at 208, 353 P.2d at 592 (1960). Upon the commissioners' subsequent appeal after judgment was entered against them, we held that officials could be liable for negligently selecting or supervising subordinates, or directing or authorizing the wrong. *Liber v. Flor,* 160 Colo. 7, 415 P.2d 332 (1966). Later cases have reaffirmed the principle that public employees are personally liable for torts committed within the scope of their employment. *Kristensen v. Jones,* 195 Colo. 122, 575 P.2d 854 (1978) (RTD driver can be held liable for negligent driving); *Antonopoulos v. Town of Telluride,* 187 Colo. 392, 532 P.2d 346 (1975) (police officers can be held liable for negligent release of drunk driver); *Flournoy v. McComas,* 175 Colo. 526, 488 P.2d 1104 (1971) (superintendent and principal may be liable for negligent supervision of student killed in auto accident); *Valdez v. County of Moffat,* 161 Colo. 361, 423 P.2d 7 (1967) (county commissioners and hospital trustees may be liable for negligent care of newborn child); *but see Quintano v. Industrial Commission,* 178 Colo. 131, 495 P.2d 1137 (1972) (individual members of industrial commission not liable for failure to inspect factory).

While it was generally held from 1960 through 1979 that officials were personally liable under Colorado law for torts committed within the scope of their employment, Colorado Court of Appeals decisions since 1979 have followed a different analysis that gives renewed strength to the doctrine

of official immunity. That court has distinguished between discretionary acts and ministerial acts, and has recognized a larger degree of immunity for officials performing discretionary acts.

Under the common law, public officials as a class have enjoyed varying degrees of immunity from lawsuits in order to encourage them in the administration of their duties and to protect them from harassing and embarrassing litigation for decisions made while performing those duties. Balanced against this policy is the concern for citizens who are injured by the acts of public officials. Because of these conflicting concerns the scope of immunity is linked with the scope of authority held by the public official. Smooth functioning of the governmental processes would be greatly impaired if officials were deterred in making their policy decisions by threats of lawsuits. This consideration is of lesser importance where the public official merely carries out the policy decisions of others. Thus an official enforcing the policy decisions of another is not afforded the same immunity as one making a policy decision.

*Cooper v. Hollis,* 42 Colo.App. 505, 507, 600 P.2d 109, 111 (1979) (citations omitted). The court of appeals concluded that police impoundment of a car was a ministerial act, and that police officers could be personally liable for wrongful impoundment subject to the defense of good faith and reasonableness. *Accord Winters v. City of Commerce City,* 648 P.2d 175 (Colo.App.1982) (building inspector may be personally liable for ministerial failure to issue permit); *Peterson v. State of Texas,* 635 P.2d 241 (Colo.App.1981) (juvenile supervisor may be personally liable for negligent supervision); *see also Flournoy v. McComas,* 175 Colo. at 530–31, 488 P.2d at 1106. Until today, this court has not had an opportunity to review the alternative analysis adopted by the Colorado Court of Appeals.

Kauvar posits that, as an official, he was not personally liable for discretionary acts

performed within the scope of his authority. Trimble states that discretionary officials enjoy only qualified immunity, and that such immunity does not shield them from liability for malicious action or action that such officials know will cause illegal injury. Trimble also questions whether Kauvar's acts were indeed discretionary and within the scope of his employment. He has not asked that we abolish the common law doctrine of official immunity, as we did the related doctrine of sovereign immunity in *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971); *but see* § 24–10–101 to –118, 10 C.R.S. (1982 and 1984 Supp.), but rather that we rule that the scope of official immunity is not so extensive as to shield Kauvar from liability in this case. *See Antonopoulos v. Town of Telluride*, 187 Colo. 392, 532 P.2d 346 (1975).

■ We note at the outset that there is serious question whether Kauvar was acting within even that broad scope of authority recognized in officials for the purpose of the official immunity doctrine. An official has no immunity for actions outside his authority. *White v. Towers*, 37 Cal.2d 727, 235 P.2d 209 (1951); *Kern v. Miller*, 216 Kan. 724, 533 P.2d 1244 (1975); *Oyler v. State*, 618 P.2d 1042 (Wyo.1980). The trial court's conclusions that Kauvar's actions in fraudulently inducing the settlement and interfering with the performance of the settlement contract were malicious and in bad faith compellingly indicate action in excess of authority. However, since there was no specific finding by the trial court on this point, and the court concluded that it was Kauvar's bad faith and malice that deprived him of official immunity protections, we shall assume for the sake of this discussion that Kauvar's actions to which Trimble would assign liability were within the scope of his office. That is, we will assume that those actions were within the outer boundaries of what the manager of Health and Hospitals may normally do, and were taken while acting under color of that authority. *See Corder v. People ex rel. Smiley*, 87 Colo. 251, 287 P. 85 (1930).

■ If the actions were within Kauvar's authority, we have no doubt that they were discretionary, not ministerial. The trial court found that they followed upon disagreements over the organization of Health and Hospitals. Such decisions involved the judgment, planning and policies of the director. They did not embody performance of a mandatory duty at the operational level. Hence, they were discretionary. *Cooper v. Hollis*, 42 Colo.App. 505, 600 P.2d 109 (1979).

■ The question that remains is what type of immunity an official like Kauvar, performing discretionary acts within the scope of his office, enjoys under Colorado law. A review of case law in this area reveals that a majority of states have adopted a general rule holding that an official performing discretionary acts within the scope of his office enjoys only qualified immunity. He is shielded from liability for civil damages only insofar as his conduct is not willful, malicious or intended to cause harm. *Bradshaw v. Prince George's County*, 284 Md. 294, 396 A.2d 255 (1979); *Smith v. Hefner*, 235 N.C. 1, 68 S.E.2d 783 (1952); *Lister v. Board of Regents*, 72 Wis.2d 282, 240 N.W.2d 610 (1976); *see also DuBree v. Commonwealth*, 481 Pa. 540, 393 A.2d 293 (1978); *Madsen v. Borthick*, 658 P.2d 627 (Utah 1983); *contra, Tango by Tango v. Tulevech*, 61 N.Y.2d 34, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983). In keeping with recent developments in Colorado law and the majority view, we now adopt this rule.[4]

4. Federal immunity law is somewhat similar to that of Colorado. Cautioning that in specific applications the law involves many intricacies, Professor Davis summarizes federal immunity law in this way:

> The framework of the law of officers' immunity can be simply stated: Judges, legislators, prosecutors, and similar officers have absolute immunity. Other officers who exercise discretionary functions have absolute immunity for nonconstitutional torts and qualified immunity for constitutional torts [e.g., illegal searches and seizures]. Officers or employees who do not perform discretionary functions have no immunity.

■ The trial court applied the correct standard when it ruled that "Dr. Kauvar's actions and intentions, ... taken as a whole, were characterized by his administrative abuse of authority in bad faith and with malice toward Dr. Trimble, which deprives Dr. Kauvar of the availability of a public official's qualified immunity from suit in tort." The legal system is sufficiently predictable that Kauvar or anyone else in his position would have determined, if the matter had been given thought, that the actions taken against Trimble would be held in a court of law to be malicious action intended to cause harm. Such reflection might have deterred him, and would not have dampened his ardor in the proper discharge of his duties. *See Gregoire v. Biddle,* 177 F.2d at 581. Hence, the trial court properly rejected the defense of official immunity, and correctly considered Trimble's claims against Kauvar on their merits.

## V.

The court of appeals held that "the trial court erred in awarding Trimble $35,000 for mental suffering caused by defendants' tortious conduct and breach of contract." *Trimble v. City & County of Denver,* 645 P.2d at 282. We hold that Kauvar is liable for mental suffering damages, but that such damages must be limited to those that resulted from fraud in the inducement and intentional interference with contractual relations. Although we agree with the court of appeals that these damages were wrongly assessed against the City, we reach that conclusion by different reasoning.

## A.

■ The question whether Kauvar was properly held liable for damages for mental

suffering need not long detain us. The trial court found that, as a result of Kauvar's pre-settlement torts as well as his later tortious conduct, Trimble suffered a permanent and substantial loss of ability to enjoy life, which the court equated with mental suffering. *Cf. Hildyard v. Western Fasteners, Inc.,* 33 Colo.App. 396, 522 P.2d 596 (1974) (loss of enjoyment of life is proper element of tort damages). The court awarded $35,000 to Trimble as damages for that injury. The court of appeals reversed because of its conclusion that Trimble's covenant not to sue barred recovery. We have determined in part II of this opinion that Trimble can recover for fraud in the inducement and intentional interference with contractual relations,[5] but not for the pre-settlement torts. Therefore, Trimble is entitled to mental suffering damages resulting from the torts of fraudulent inducement and intentional interference but not for the others. The same is true of the $15,000 award for loss of reputation and the $20,000 punitive damages. With respect to damages for intentional interference, see generally *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207 (Colo. 1984); Restatement (Second) of Torts § 774A(1) (1977); W. Prosser, *The Law of Torts* 948–49 (4th ed. 1971). On remand, the trial court must limit the damages to those that resulted from the torts for which Kauvar was properly held liable and enter judgment for those amounts.

## B.

■ The court of appeals determined that the City could not be held liable in contract for Trimble's mental suffering

*K. Davis, Administrative Law Treatise,* § 26.15 (1982 Supp.). *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). We have no occasion in this case to explore the contours of the law of absolute immunity in Colorado.

For a discussion of the policy implications of limiting governmental and official immunity, see Bermann, *Integrating Governmental and Officer Tort Liability,* 77 Col.L.Rev. 1175 (1977).

5. Although Kauvar can be held liable for these torts, the City enjoys statutory sovereign immunity for all tort claims not enumerated in section 24–10–106, 10 C.R.S. (1982), and thus cannot be held liable on a respondeat superior theory. The City is also not required to pay for judgments against its employees where the act complained of was willful or wanton. § 24–10–110(1)(b)(I), 10 C.R.S. (1982).

damages. It reasoned that in order to recover such damages in contract a party aggrieved must show either (1) "that the defendant's conduct which accompanied the breach could have been the basis of an independent tort claim for negligent or intentional infliction of emotional distress," 645 P.2d at 282, or (2) that the contract breached was "of such a personal or special nature that the parties knew, or should have foreseen, that a breach by one of them would result in severe mental or emotional distress." 645 P.2d at 282–83.

▮▮▮ Putting aside for the moment the second alternative basis for recovery, we believe that the first has no foundation in our law, and we do not approve it. It is well-established that, in contract cases, damages for mental suffering are recoverable for willful or wanton breach when they are a natural and proximate consequence of the breach. *McCreery v. Miller's Groceteria Co.*, 99 Colo. 499, 64 P.2d 803 (1937); *Fitzsimmons v. Olinger Mortuary Association*, 91 Colo. 544, 17 P.2d 535 (1932). As stated by the original court of appeals of Colorado, "in cases where a breach of contract has occurred and the acts attending such breach are accompanied by willful, insulting or wanton conduct of the one guilty of the breach, substantial damages may be recovered for mental suffering only ..." *Hall v. Jackson*, 24 Colo. App. 225, 228, 134 P. 151, 152 (1913). *Accord Rederscheid v. Comprecare, Inc.*, 667 P.2d 766 (Colo.App.1983); *Farmers Group, Inc. v. Trimble*, 658 P.2d 1370 (Colo.App. 1982). We perceive no reason to depart from this settled authority and to impose a higher threshold of recovery based on principles transplanted from the law relating to the tort of intentional infliction of emotional distress. *Cf. Rugg v. McCarty*, 173

Colo. 170, 476 P.2d 753 (1970) (setting out the elements...of that tort.) [6]

▮▮▮ Thus, the question upon which turns the City's liability for mental suffering as an element of contract damages is whether its conduct was willful and wanton. Based on the trial court's findings, the conduct of Kauvar was of that quality. Therefore, if Kauvar's actions can be imputed to the City, damages for mental suffering were properly assessed against the City.[7]

The trial court's findings, however, establish satisfactorily that Kauvar's willful and malicious actions cannot be imputed to the City. When Kauvar interfered with the City's contract with Trimble, the trial court found, he was not acting for any valid administrative reason and was not acting in the best interests of his principal. Therefore, his improper intentions cannot logically be attributed to the City. Although the City did breach the contract, there is no evidence that anyone other than Kauvar acted willfully or wantonly to cause this breach.[8] While we, recognize that Kauvar may have been acting with respect to subject matter within his discretionary authority, as such authority is broadly defined for purposes of official immunity law, we believe that, under the facts of this case, his improper intentions cannot rightly be attributed to the City.

▮▮▮ Lastly, we must determine whether damages for mental suffering can be recovered without proof of willful or wanton conduct based on the cases that permit such recovery where the contract is of such a personal and special nature that the parties knew, or should have known, that a breach would result in severe mental or emotional distress. *See Fitzsimmons v. Olinger Mortuary Association*, 91 Colo.

---

**6.** While we find it unnecessary to discuss whether Kauvar's actions rose to the level of outrageous conduct, we do not wish to be understood as endorsing the court of appeals' conclusion that they did not.

**7.** The City is protected by sovereign immunity in certain tort actions, but enjoys no such protection against contract claims. *Spaur v. City of*

*Greeley*, 150 Colo. 346, 372 P.2d 730 (1962); § 24–10–102 and –106, 10 C.R.S. (1982).

**8.** We do not believe that the delay in making the May or June contract payments rises to the level of willful or wanton breach under *McCreery v. Miller's Groceteria Co.* and other cases in that line.

544, 17 P.2d 535 (1932); *Westesen v. Olathe State Bank*, 78 Colo. 217, 240 P. 689 (1925). Cases in this category have been limited to those presenting a narrow range of special circumstances. Here, it was not the mere passive failure to perform by the City that caused foreseeable mental suffering to Trimble. Rather, it was Kauvar's active and intentional thwarting of Trimble's contractual goals without valid administrative reason and contrary to the best interests of the City that produced the damages. We agree with the court of appeals that this case does not fall within the cases recognizing an exception to the willful and wanton conduct requirement in special circumstances.

## VI.

The judgment of the court of appeals is affirmed in part and reversed in part. The holding that the covenant not to sue barred Trimble's action against Kauvar is affirmed as to pre-settlement torts, and reversed as to the torts of fraudulent inducement and intentional interference with contractual relations. The trial court correctly entered judgment in the amount of $14,062.50 jointly and severally against the City for breach of contract and against Kauvar for intentional interference with contractual relations. The trial court's award of $35,000 against the City for mental suffering based on breach of contract was properly reversed by the court of appeals. The trial court must vacate its earlier awards of damages against Kauvar in the amounts of $15,000 for loss of reputation, $35,000 for mental suffering, and $20,000 for punitive damages and enter new awards limited to the damages that flowed from the torts of fraudulent inducement and intentional interference with contractual relations. The trial court may decide in its discretion whether additional evidence should be taken to determine the extent of the damages attributable to these

torts. We remand this case to the court of appeals with directions to return it to the trial court for entry of judgment consistent with this opinion.

NEIGHBORS, J., dissents in part.

QUINN and KIRSHBAUM, JJ., do not participate.

NEIGHBORS, Justice, dissenting in part:

Because I disagree with the court's analysis and resolution of Trimble's claim against the City for mental suffering, I respectfully dissent to section V.B. of the majority opinion. I agree with the court's formulation of the general rule: Damages for mental suffering are not recoverable in a breach of contract action unless (1) the breach was willful or wanton or (2) the contract is of such a personal and special nature that serious emotional disturbance was a particularly likely result of a material breach. I conclude that the majority's application of the rule to the facts in this case produces a result inconsistent with the present state of the law.

## A.

The court's opinion strongly suggests that an employee's willful and wanton tortious conduct which constitutes the breach of the contract between the employer and a third person cannot be imputed to the employer.[1] If, indeed, this is the rule adopted here, it is at odds with our holding in *McDonald v. Lakewood Country Club*, 170 Colo. 355, 461 P.2d 437 (1969), where, in the context of a tort claim, we stated: "[T]he acts of a corporate employee, if within the scope of his employment, make the doctrine of *respondeat superior* applicable." 170 Colo. at 362, 461 P.2d at 440. (citations omitted). I fail to see why the same rule should not be applicable to contract claims.[2] In *McDonald*, the plaintiff

---

**1.** The trial court found that "[t]he defendant, City and County of Denver, acting through Dr. Kauvar and the Auditor, materially breached the settlement contract of December, 1974 by prohibiting Dr. Trimble from performing the

services allowed or required by the contract and by failing to pay him in a timely manner."

**2.** The general rule is summarized as follows:

alleged that the defendants "perpetrating the said false arrest and imprisonment of [plaintiff], were intentional or in willful and wanton disregard of the rights and feelings of the plaintiff." *Id.* at 361, 461 P.2d at 440.

Moreover, there is considerable tension between the court's determination that Kauvar was acting "within the outer boundaries" of his discretionary authority for purposes of resolving the immunity issue *Trimble v. City and County of Denver*, 697 P.2d 716, 729 (Colo.1985), and the majority's summary conclusion that Kauvar's "improper intentions cannot rightly be attributed to the City." At 731.

### B.

I think it unwise to address the issue of whether Kauvar's willful and wanton conduct should be imputed to the City when the special contract analysis yields a satisfactory solution to the question of whether the City is liable for mental suffering damages. The trial court made the following pertinent factual finding:

> It reasonably appears that Dr. Trimble entered into the settlement so that he could have the opportunity to teach and render patient care in the emergency medical services area of the Hospital as a means of attempting to restore his loss of reputation as a result of the preceding events.

In *Westesen v. Olathe State Bank*, 78 Colo. 217, 240 P. 689 (1925), we allowed the plaintiff to recover damages for mental suffering against a bank that breached its contract to furnish him credit for a trip to another state when it refused to honor the plaintiff's checks during his vacation in California. The court stated:

> Defendant in error further contends that plaintiff cannot recover for mental suffering and humiliation unless there was a wilful wrong on the part of defendant. That might be true in cases where mental pain and suffering alone is the ground of recovery. (Citations omitted.) But where, as here, other grounds of recovery are laid, "the grounds for an allowance of exemplary damages need not be present." 17 C.J. 830. No wilful wrong need be present.

78 Colo. at 220, 240 P. at 691. Admittedly, the court's analysis in *Westesen* is less than complete and in need of explication. Therefore, I would adopt the test enunciated by the North Carolina Supreme Court in *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611, 620 (1979):

> [W]e hold that a claim for mental anguish damages resulting from breach of contract is stated only when the plaintiff's complaint reveals the following. First, that the contract was not one concerned with trade and commerce with

---

A municipality as a legal entity cannot commit a willful or negligent act, but can only do so through its agents or servants. And a municipality is liable for the willful or malicious acts of its agents, where done within the scope of their duties, although there is no ratification of the act by the municipality. Likewise, in a proper case a municipality may be held liable for fraud and deceit practiced by its officers. 18 E. McQuillan & S. Flanagan, *Municipal Corporations* § 53.62 (1984) (footnotes omitted). However, in *McIntosh v. City and County of Denver*, 98 Colo. 403, 55 P.2d 1337 (1936), we held that the city could not be held vicariously liable to the plaintiff based on his allegations that the city police officers had wantonly and maliciously arrested, imprisoned, and prosecuted him without probable cause. The doctrines of *respondeat superior*, vicarious liability, and the like have neither been briefed nor argued in this case. Those issues may be resolved

in connection with the indemnification claim filed by Kauvar against the City of Denver. The indemnification claim was severed pursuant to the agreement of the parties and the final judgment concerning Trimble's claims against the City and Kauvar was certified pursuant to C.R. C.P. 54(b). In addition, the pleadings filed in connection with the indemnification claim reflect that the City of Denver had adopted a charter amendment, since repealed, in which it elected to treat itself as a private employer and was required to pay judgments entered against its employees up to $100,000, but was not liable for punitive damages awarded against its employees. *See* Charter of the City and County of Denver Art. VI, § C6.8–1. In light of the pending issues remaining in the trial court and the impact of any decision we might make concerning imputing willful and wanton conduct to the City, I believe this provides one more reason why we should avoid addressing that issue in connection with this case.

734

concomitant elements of profit involved. Second, that the contract was one in which the benefits contracted for were other than pecuniary, *i.e.*, one in which pecuniary interests were not the dominant motivating factor in the decision to contract. And third, the contract must be one in which the benefits contracted for related *directly* to matters of dignity, mental concern or solicitude, or the sensibilities of the party to whom the duty is owed, and which *directly* involves interests and emotions recognized by all as involving great probability of resulting mental anguish if not respected.

(Emphasis in original.) The *Stanback* test is consistent with section 353 of the Restatement (Second) of Contracts, which provides: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result."

In addition to the provisions of the contract enumerated in the court's opinion, *Trimble*, 697 P.2d at 721, the contract also limited the City's financial obligation to Trimble at $19,500 per year. Trimble had the right to terminate the contract upon thirty days written notice to the City. On the other hand, the City was required to give notice of its desire to terminate the contract at least ninety days prior to the expiration of the contract term in any given contract year. The contract also provided for the disclosure of confidential information to third persons at such time as Trimble applied for an academic appointment or professional employment. Given the trial court's factual determination that the purpose of the contract was to rehabilitate Trimble's reputation and from my examination of the contract,[3] I am persuaded that the *Stanback* standard is met here. The contract was not concerned with trade and commerce, nor was any significant profit involved. Second, the pecuniary interests were not the dominant motivating factor in the decision of the parties to contract. Fi-

nally, one's reputation as a physician is directly related to matters of dignity, mental concern, and solicitude. An objective review of the contract demonstrates that the trial court's factual determination is correct. The obvious purpose of the contract was to provide Trimble with an employment base and minimal income so that he could pursue other professional opportunities.

I would hold that the City is liable to Trimble for the mental damages he sustained as a result of the City's breach of contract.

---

**3.** Interpretations of contracts are questions of law. *E.g., People v. Johnson,* 618 P.2d 262 (Colo. 1980); *Radiology Professional Corp. v. Trinidad Area Health Ass'n., Inc.,* 195 Colo. 253, 577 P.2d 748 (1978).