**E.B. JONES CONSTRUCTION COMPA-
NY and Stewart-Decatur Security
Systems, Inc., Plaintiffs-Appellees,**

v.

**CITY AND COUNTY OF DENVER, a
municipal corporation,
Defendant-Appellant.**

No. 82CA0985.

Colorado Court of Appeals,
Div. II.

Feb. 20, 1986.

As Modified on Denial of Rehearing
March 20, 1986.

DeMoulin, Anderson, Campbell & Laugesen, P.C., Laird Campbell, Denver, for plaintiff-appellee E.B. Jones Const. Co.

Douglas John Traeger, Denver, for plaintiff-appellee Stewart-Decatur Sec. Systems, Inc.

Stephen H. Kaplan, City Atty., Stan M. Sharoff, Sidney Biderman, John Eckhardt, Joel Kohn, Asst. City Attys., Denver, for defendant-appellant.

STERNBERG, Judge.

Defendant City and County of Denver appeals from a judgment entered in favor of plaintiffs, E.B. Jones Construction Company (Jones) and Stewart-Decatur Security Systems, Inc. (Stewart). We affirm in part, reverse in part, and remand.

This action arose out of disputes regarding substantial delays in the construction, between 1974 and 1978, of the Denver Police Administration and Pre-Arraignment Detention Facility. The trial court made extensive, detailed findings of fact, overwhelmingly substantiated by the record, which may be summarized as follows.

Construction of the facility, a complex and difficult project, was among Denver's first efforts to plan, manage, and supervise major construction without the services of a general contractor. Under prior well-established procedures and as provided in the Denver Charter, Denver would select a general contractor after taking competitive bids. The general contractor would be responsible for management of subcontractors bidding on and performing various components of the actual construction, including coordination and scheduling of both preparatory and on-site phases of their work. In order to assure timely, efficient, and proper performance, thus protecting Denver's interests under the general contract, experienced City and County engineering and public works personnel would be responsible for direct supervision of the general contractor.

This project, however, was to be managed as a co-venture pursuant to the terms of a Project Management Agreement made with N.G. Petry Construction Co. and C.M. Associates, Inc., (Petry-CM). By the terms of this agreement Petry-CM was to "establish and implement a comprehensive management program, including all direction, procedures, coordination, administration, review, expediting and counseling required to assist the City and its designated consultants and contractors in completing the Project in a timely, economical and acceptable manner." This contract was secured without competitive bidding, and compensation for Petry-CM was fixed by negotiation rather than by bid. The trial court found that the Agreement established Petry-CM as professional agent of Denver in all phases of design and construction of the facility.

It was contemplated that the project was to be managed under a method known as "phased" or "fast-track" construction. This is a technique whereby plans and specifications are prepared after construction has begun and only as they become necessary in order to proceed with each of the various stages of the construction process, including contract bidding and both the preparatory and on-site work of contractors. As compared with management by a general contractor, its purpose is to shorten the construction process by obviating the need to complete plans for an entire project before opening it for bid. The use of this method demands exacting coordination and scheduling of the various contract components of a project and precise management of on-site conditions if work is to be performed efficiently and without delay.

Through Petry-CM, Denver was to control progress pursuant to express conditions inserted at the suggestion of Petry-CM in each of the twenty-two contracts entered into for the project. General Condition C–49 provided for termination by Denver. Special Condition 12 stated that "[a]ll Contractors understand and agree that all work must be performed in an orderly and closely coordinated sequence so that the date for substantial completion may be met ..." and gave Denver options to enforce timely performance. Each contract further specified a time frame within which performance was to occur.

The trial court found that these factors—the agreement with Petry-CM, the management method chosen, and the language of individual contracts as relied upon by contractors in fixing their bids—combined to impose upon Denver the responsibility "to organize, schedule, coordinate, expedite and generally supervise and manage the work of all twenty-two contracts in order that each ... could perform its work under its contract" in a timely, economical, and acceptable manner and "to select a manager which had the expertise, capability and qualifications to do so." The court found that this responsibility arose both as a material and mutually contemplated contractual duty and as a duty of reasonable care in the circumstances.

Petry-CM, however, had no experience in managing projects such as the construction of the facility. This fact was known to Denver prior to its agreement with Petry-CM. Petry-CM represented to Denver that it would select a construction manager who had the requisite experience but it did not do so. In fact, the construction manager selected by Petry-CM did not have experience with the phased construction management methods used on the project. Denver became aware of these facts also but did nothing to cause Petry-CM to substitute a more qualified manager.

Further, the procedures through which City and County offices had supervised and administered construction contracts were bypassed by Denver's creation of a new office to supervise construction of the facility. This office was under the initial direction of an ex-sportscaster and, later, a man professionally trained as a traffic engineer, neither of whom had the required construction experience. These persons were given control of all scheduling while more highly qualified City and County personnel were relegated to ministerial roles.

The trial court specifically found that, prior to awarding the project contracts, Denver and Petry-CM knew or should have known that compliance with the schedules specified therein was impossible. The trial court also found that Petry-CM knew, through prior experience with General Condition 49 and Special Condition 12, that these methods of control actually slowed and hindered construction rather than expediting it.

Jones was the successful bidder on the contract for placing building concrete. Time of performance was to be 365 days beginning October 1, 1975. Jones received a notice to proceed beginning January 5, 1976. Because of various delays on the project, it could not begin until February 25. Jones was also to perform "site work," including such tasks as paving sidewalks and ramps, but when this work was to be begun the areas to be paved were in use for storage of materials used by other contractors.

In spite of the fact that installation of the concrete was to be completed before installation of the facility's security system began, the system was initially planned to be installed between October 10, 1975, and July 1976. Stewart was the successful bidder on this contract. As it turned out, Stewart received a notice to proceed dated April 8, 1975, at which time the project was still clearly not at the stage required for Stewart's work. Later notice ordered Stewart to begin work September 1, 1976, a full month after its work was to have been completed under its contract.

The trial court found that both plaintiffs did everything reasonably possible to expedite efficient performance of their contract obligations and that both would have fin-

ished performance as specified in their contracts but for breach of the duties assumed by Denver through gross mismanagement of the project by Denver and Petry-CM. The court found that there was no other cause for the expensive delays suffered by plaintiffs.

Further, in early 1976, when plaintiffs first notified Denver and Petry-CM of increased expenses because of delays, Petry-CM advised them to submit claims with substantiating data after completion and acceptance of their individual work and clearly represented that their claims would be paid. However, in February 1977, Denver determined not to pay such claims. Petry-CM was made aware of this decision soon thereafter. Jones was not notified of this change of position until November 1977, and Stewart was not notified until February 1978, after each had completed work.

The trial court found that Denver, by failing to advise plaintiffs of its change of policy, knowingly made false representations to plaintiffs that their claims would be paid with the intention of inducing plaintiffs to continue and finish work. It further found that Denver accepted the facility as a quality structure unjustly and inequitably obtained at plaintiffs' expense.

The trial court concluded that Denver was liable to each plaintiff under theories of breach of contract, estoppel by representation, unjust enrichment, and negligence. Both Jones and Stewart were awarded damages including delay costs and moratory interest, court costs, and, pursuant to post-trial motion and order, attorney fees.

## I. Basis of Recovery

Denver's principal argument is that the Denver City Charter Provision A6.15 bars any recovery based in contract. This provision states that:

"Neither the council nor any officer shall have authority to make any contract or do anything binding on, nor impose upon the City and County any liability to pay money, until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the City and County under such contract, or in consequence thereof. Such contract shall be *ab initio*, null and void as to the City and County for any other or further liability...."

This provision represents one legislative source for the proposition that "appropriation is indispensable to obligation," applied in *Kingsley v. Denver*, 126 Colo. 194, 247 P.2d 805 (1952) and the line of cases most recently supplemented by *R.L. Atkins, Inc. v. ARIX*, 675 P.2d 336 (Colo.App.1983) and *F.J. Kent Corp. v. Town of Dillon*, 648 P.2d 669 (Colo.App.1982).

Because it is undisputed that Denver appropriated no funds to pay the amounts claimed as damages in this case, Denver contends that plaintiffs may not recover. While resisting this argument, the plaintiffs contend that Denver, proceeding through a former city attorney, failed properly to preserve it as a ground of reversal. We agree with plaintiffs.

### A. New Trial Motion

■ The parties do not dispute that, here, this question is controlled by C.R.C.P. 59(f) as it existed before its repeal and reenactment in 1984. *Compare* C.R.C.P. 59, in C.R.S. Vol. 7A *with* C.R.C.P. 59 in C.R.S. Vol. 7A 1985 Cum.Supp. This version of the rule states that "only questions presented in [the new trial motion] will be considered by the appellate court on review...." General allegations of error do not comply with the rule; errors relied on as grounds for reversal should be stated with some degree of specificity. *See Martin v. Opdyke Agency, Inc.*, 156 Colo. 316, 398 P.2d 971 (1965); *Jones v. Dunlap*, 78 Colo. 221, 239 P. 989 (1925).

Neither Denver's motion for new trial nor its supporting memorandum mentions Provision A6.15 or the "no appropriation—no obligation" theory. We conclude therefore that the motion for new trial failed to preserve for review in this court the question whether Provision A6.15 bars plaintiffs' recovery as based in contract. *See Furer v. Allied Steel Co.*, 174 Colo. 171,

483 P.2d 212 (1971); *Jones v. Dunlap, supra.*

### B. C.R.C.P. 60(b) Motion

■ Denver contends in its briefs, however, that the Provision A6.15 defense was properly preserved for review because the trial court heard arguments concerning and denied a pleading entitled "Defendant's Supplement to Motion for New Trial and Memorandum Brief and Motion to Set Aside Judgments Under Rule 60(b), C.R.C.P." The trial court's findings of fact and conclusions of law were filed on December 18, 1981, and, pursuant to motion for an extension, Denver's new trial motion was to be filed on or before January 18, 1982. The pleading here at issue was filed on April 8, 1982. We conclude that, insofar as Denver's argument rests on the "Supplement to Motion for New Trial" portion of this pleading, the issue was not timely raised and the trial court did not err in disallowing the supplement. We need only determine, therefore, the effect of the portions styled "Motion to Set Aside Judgments Under Rule 60(b) C.R.C.P."

The arguments made in the April 8 pleading are premised on the then-recent announcement of this court's decision in *F.J. Kent Corp. v. Town of Dillon, supra.* That case reiterates a rule of law long established in Colorado. The application of that rule to the facts of this case was repeatedly argued at trial and was rejected by the trial court. Only in the last sentence of its pleading does Denver try to connect the announcement of *F.J. Kent* to C.R.C.P. 60(b), and this is by the bare assertion that "based upon the *Kent* decision ... the judgments entered herein ... should be set aside and vacated ... because the judgments are void as a matter of law (Rule 60(b)(3)) and the provisions of Rule 60(b)(4)(5) apply herein and should be applied." The latter subsections provide for relief from a judgment when "(4) the judgment has been satisfied, released, or discharged or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment."

■ The thrust of C.R.C.P. 60, as we perceive the rule, is to allow a court that has rendered judgment the opportunity to change it when significant new matter of fact or law arises which is extrinsic to it because of not having been presented to the court. Invocation of the rule demands scrupulous consideration of strong policies favoring finality of judgments. *See People v. Lupton,* 652 P.2d 1080 (Colo.App.1982). *See generally* 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2851 et seq. (1973) (reviewing federal case law interpreting Fed.R.Civ.P. 60). Thus, "Rule 60 is not a substitute for appeal, but instead is meant to provide relief in the interest of justice in extraordinary circumstances." *Cavanaugh v. State Department of Social Services,* 644 P.2d 1 (Colo.1982). The moving party must clearly establish the existence of one of the grounds of relief afforded by the Rule. *See Biella v. State Department of Highways,* 652 P.2d 1100 (Colo.App.1982), *aff'd,* 672 P.2d 529 (Colo.1983).

■ Judgments based upon erroneous applications of law are nonetheless valid and effective until successfully challenged; a judgment is void only if the rendering court lacked jurisdiction of the subject matter or the parties or acted in violation of due process of law. *See* 11 C. Wright & A. Miller, *supra,* at § 2862. Judgments that determine the rights of parties and award damages as "a present remedy for a past wrong," are not "prospective" within the meaning of subsection (4). *See, e.g., Cook v. Birmingham News,* 618 F.2d 1149 (5th Cir.1980) (interpreting Fed.R.Civ.P. 60(b)(5), identical to C.R.C.P. 60(b)(4)). Allegations that a court has erroneously applied the law do not bring a party within subsection (5) of C.R.C.P. 60(b). *See, e.g., United States v. 119.67 Acres of Land,* 663 F.2d 1328 (5th Cir.1981) (interpreting Fed. R.Civ.P. 60(b)(6), identical to C.R.C.P. 60(b)(5)).

The grant or denial of a C.R.C.P. 60(b) motion lies within the sound discretion of

the trial court and, absent abuse of that discretion, will not be disturbed on appeal. *See Columbine Valley Construction Co. v. Board of Directors,* 626 P.2d 686 (Colo. 1981).

■ Denver presents no arguments that would support or justify the conclusion that the appearance of a case merely reiterative of a point of law litigated at trial and finally ruled upon by the trial court is an extraordinary circumstance properly within the ambit of any ground for relief provided by C.R.C.P. 60(b). Here, there is a valid and effective judgment for damages which has not been satisfied, released, or discharged. Neither was it based on a prior judgment subsequently reversed or otherwise vacated. Based upon the authorities cited, we conclude that defendant does not present even a colorable claim for relief under C.R.C.P. 60(b)(3), (4), or (5). Hence, the trial court did not err in denying this "motion."

Further, we agree with plaintiffs that the C.R.C.P. 60(b) portion of the April 8 pleading is an attempt to use the rule as a substitute for timely appeal of the trial court's rulings concerning the application to the facts of this case of Denver City Charter Provision A6.15. Denver's proper remedy on this issue was to preserve the question by motion for new trial. Having failed so to do, Denver may not now place the issue before this court.

■ We hold, in accordance with well-established authority, that "an appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." *Browder v. Director,* 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1968), *quoted in Morris v. Adams-Millis Corp.,* 758 F.2d 1352 (10th Cir.1985) (where no notice of appeal was filed, possibly erroneous ruling was not reviewable on review of subsequent order denying Fed.R.Civ.P. 60(b) motion filed after expiration of time for appeal).

Based on the foregoing, we hold that Denver has failed to preserve for review any challenges to plaintiffs' recovery as based in breach of contract.

## II. Damages

Stewart was awarded damages including the following elements: Delay costs in the amount of $57,315.08; $14,417.24 as moratory interest on its costs and retainages held by Denver, calculated at 8% from the date of completion specified in its contract until the date of its formal claim to Denver; and moratory interest on the sum of these amounts from the date of claim until the judgment was entered. Denver argues that the trial court erred by awarding the $14,417.24. We disagree.

In basing its arguments on a theory of debt and account, Denver misconstrues the basis of the court's award. Citing *Southway Construction Co. v. Adams City Service,* 169 Colo. 513, 458 P.2d 250 (1969), it argues that it was prevented by statute from returning retainages, and citing *Bassick Gold Mine Co. v. Beardsley,* 49 Colo. 275, 112 P. 770 (1910), it maintains that interest was barred because Stewart applied for and accepted payment for work completed, thereby extinguishing and waiving any claim for interest. Alternatively, Denver argues that plaintiffs may not recover because the city obtained no benefit from non-payment of monies due, citing *Asphalt Paving Co. v. U.S. Fidelity & Guaranty Co.,* 671 P.2d 1013 (Colo.App. 1983) (interest on unliquidated amount owed under performance bond not available as damages where defendant did not benefit from plaintiff's loss of funds held by third party). Neither position, however, addresses the concept of moratory interest relied upon by the trial court in assessing damages.

■ Conventional interest as a matter of contract and statutory prejudgment interest on particular kinds of damage awards are to be distinguished from moratory interest. Moratory interest is an element of damage in itself which is allowed as compensation for the detention and use of money. *See* 22 Am.Jur.2d *Damages* § 179 (1965).

In *Davis Cattle Co. v. Great Western Sugar Co.,* 393 F.Supp. 1165 (D.Colo.1975), *aff'd* 544 F.2d 436 (10th Cir.1976), *cert.*

*denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977), the court conducted an exhaustive survey of Colorado law concerning the availability of such damages. It concluded that moratory interest is available as damages under circumstances in which statutory interest would not be awardable on "all monies after they become due, on any bill, bond, promissory note, or other instrument of writing ... on money due on mutual settlement of accounts ... [or] due on account ... and on money received to the use of another and retained without the owners consent ... and on money taken or retained and fraudulently converted to the taker's use...." *See* § 5–12–102, C.R.S.

Allowance of moratory interest is a matter committed to the sound discretion of a court in consideration of the equities of a case. *See Alfred Brown Co. v. Johnson-Gibbons & Reed Western Paving-Kemper,* 695 P.2d 746 (Colo.App.1984).

 Here, the injustice of Denver's actions is manifest: the trial court's findings and conclusions are replete with statements of dismay and outrage regarding the facts surrounding its failure to pay both plaintiffs' claims. We are particularly influenced by the finding, noted above, that Denver determined, and Petry-CM knew, that delay costs would not be paid, yet it withheld this information with the obvious intention of getting something for nothing.

Having found that moratory interest was justified and that Denver inequitably and unjustly refused to pay Stewart damages due and claimed as early as March 1976, the court correctly concluded that, absent proof of Denver's gain from its retention of the money, Stewart's moratory interest damages were to be measured at the statutory rate of 8%. *See* § 5–12–101, C.R.S. (1985 Cum.Supp.); *Banker's Trust Co. v. International Trust Co.,* 108 Colo. 15, 113 P.2d 656 (Colo.1941). We find no abuse of discretion here, and we conclude that the trial court did not err in awarding $14,417.24 as moratory interest damages.

### III.

 We do, however, agree with Denver's final contention, that the trial court erred in awarding attorney fees to plaintiffs.

Attorney fees were granted in this case pursuant to Colo.Sess.Laws 1977, ch. 189, § 13–17–101 at 796. This statute provides fees may not be awarded "unless [the court] finds that the bringing, maintaining, or defense of the action against the party entitled to such award was frivolous or groundless," and sets out factors to guide the discretion of the court in determining the availability and amount of the award. Colo.Sess.Laws 1977, ch. 189, § 13–17–102 at 797.

The trial court awarded attorney fees based on its finding that throughout the parties' relationship Denver's conduct was unconscionable, shocking, and in bad faith. However, under *Western United Realty, Inc. v. Isaacs,* 679 P.2d 1063 (Colo.1984), an award of attorney fees is permissible only if the defenses during litigation are frivolous or groundless. As stated in *Western United Realty,*

> "[a] claim or defense is frivolous if the proponent can present no rational arguments based on the evidence or law in support of that defense.... Similarly, a claim or defense is groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial."

We cannot say that no rational arguments were presented in support of Denver's defenses, nor that the defenses were not supported by some credible evidence. Therefore, the trial court erred in granting attorney fees to plaintiffs.

We have considered Denver's other contentions of error and find that they are either without merit or rendered inapposite by the foregoing analysis.

Accordingly, the judgment is affirmed in all respects except as to the award of attorneys fees; that portion of the judgment is reversed, and the cause is remanded to

deduct the attorney fee award from the judgment.

SMITH and BERMAN, JJ., concur.