Edward BALLOW, D.P.M.; Foot Associates, P.C.; Mark P. Berland, D.O.; Richard N. Bernhardt, M.D., Richard N. Bernhardt, M.D., P.C.; Leonard D. Bernstein, M.D., The OB/GYN Associates, P.C.; J. Tashof Bernton, M.D.; J. Tashof Bernton, M.D., P.C.; Roland J. Brandt, D.O.; High Country Orthopedic Associates of Colorado Springs, P.C.; Robert A. Brumfield, M.D.; Rustic Hills Orthopaedic Association, P.C.; W.M. Campbell, M.D.; Southern Colorado OB/GYN, P.C.; Joseph Carpenter, M.D.; Joseph Carpenter, M.D., P.C.; John Chisholm, M.D.; Denver Obstetrical and Gynecological Associates, P.C.; Harvey M. Cohen, M.D.; Cohen and Conner Professional Corporation; Wayne Conner, M.D.; Gayle P. Crawford, M.D.; Drs. Ross and Crawford, P.C.; David L. Crosson, M.D.; Pueblo Orthopedic Professional Corporation; Jacqueline M. Demolin, M.D.; Goodman OB/GYN Associates, P.C.; Larry M. Dewell, M.D.; Beverly E. (Jessup) Donnelly, M.D.; Fort Collins Women's Clinic, P.C.; Terry A. Downing, M.D.; Terry A. Downing, M.D., P.C.; John H. Drabing, D.O.; Thomas F. Driver, M.D.; Paul S. Drohan, M.D.; Paul S. Drohan, M.D., P.C.; Edward Duerksen, M.D.; Edward Duerksen, M.D., P.C.; Samuel C. Duhon, Jr., M.D.; Samuel C. Duhon Jr., M.D., P.C.; Edward L. Ehrichs, M.D.; Reich & Ehrichs, P.C.; Frederick C. Feiler, M.D.; Glen C. Ferguson, D.O.; Glen C. Ferguson, D.O., P.C.; Glenn T. Foust, III, M.D.; Denver–Evergreen OB/GYN Group, P.C.; Donald P. Gazibara, M.D.; W.B. Goddard, M.D.; Woodridge Women's Clinic, P.C.; Reid A. Goodman, M.D.; Stanley N. Goodman, M.D.; Ronald A. Green, D.P.M.; Michael L. Hall, M.D.; Linder and Hall OB/GYN Associates, P.C.; Gordon C. Ham, M.D.; Gordon C. Ham, M.D., P.C.; Richard G. Hamill, M.D.; David Harris, M.D.; David Harris, M.D., P.C.; Lowell N. Harris, M.D.; James F. Hartman, M.D.; James F. Hartman, M.D., P.C.; Duval E. Harvey, M.D.; Robert W. Hendee, Jr., M.D.; Pediatric Neurosurgery, P.C.; Raymond W. Henry, M.D.; David F. Holz, D.P.M.; Allied Foot and Ankle Clinics of Colorado, P.C.; Brett S. Hulet, M.D.; Herbert L. Jacobs, M.D.; Valerie A. Jacobs, M.D.; David Kessel, M.D., P.C.; Arvada Pediatric Associates, P.C.; Ransy L. Jeffrey, M.D.; Johnny E. Johnson, Jr., M.D.; Johnny E. Johnson, Jr., M.D., P.C.; Elisabeth Kandel, M.D.; Family Medicine Associates; Ralph L. Kelley, M.D.; Corwin Orthopedic Group, P.C.; Kelvin F. Kesler, M.D.; David Kessel, M.D.; Thomas E. Kilfoyle, M.D.; Edward Kirschman, M.D.; Michelson, Losasso, Kirschman, M.D., P.C.; Joshua J. Kopelman, M.D.; Eugene E. Lalli, D.O.; Eugene E. Lalli, D.O. & Associates, P.C.; David Leistikow, M.D.; Edward Lord, M.D.; Leonard J. Losasso, M.D.; Stephen L. Ludwig, M.D.; Gary A. Ludwin, M.D.; Eva Martin, M.D.; Thomas Tuttle McCarthy, D.O.; Edward Larry McCleary, M.D.; James W. Meeuwsen, M.D.; M.H. Melmed, M.D.; M.H. Melmed, M.D., P.C.; T. Robert Mestas, M.D.; Gary A. Meyer, D.O.; Abraham K. Michelson, M.D.; David J. Muller, M.D.; Martin E. Nowick, M.D.; Martin E. Nowick, M.D., P.C.; E.P. O'Loughlin, M.D.; Robert P. Paunovich, D.O.; Mark W. Pfenninger, M.D.; Mark W. Pfenninger, M.D., P.C.; Peter Press, M.D.; Anesthesia Associates, P.C.; Alan M. Rapaport, M.D.; Marshall P. Reich, M.D.; Bruce C. Richards, M.D.; Ira Rifkin, M.D.; Ira Rifkin, M.D., P.C.; Michael H. Ross, M.D.; Nancy A. Rudd–McCoy, M.D.; Keith Sadler, M.D.; Keith Sadler, M.D., P.C.; Ron Schneebaum, M.D.; Joseph M. Sherman, M.D.; Lloyd V. Shields, M.D.; Joseph Shroyer, M.D.; Murray M. Snyder, D.O.; Contemporary OB/GYN, P.C.; Stanley H. Solomon, D.P.M.; Lawrence Spivack, M.D.; Colorado Eye Specialists, P.C.; Stephen L. Stoll, M.D.; Phillip Tannenbaum, M.D.; Phillip Tannenbaum, M.D., P.C.; Richard C. Taylor, M.D.; Arapahoe Bone and Joint Surgeons, P.C.; Dwayne Thomason, D.O.; Yona Victor, M.D.; Joan Weiss, M.D.; Robert Weiss, D.O.; Robert Weiss, D.O., P.C.; Max L. Weissman, M.D.; Russell J. Weister, M.D.; Harry

Wherry, M.D.; Patrick Wherry, M.D.; Kevin Whitaker, M.D.; Derek Williams, M.D.; Murray S. Willis, M.D.; Murray S. Willis, M.D., P.C.; Mark R. Wolf, M.D.; S. Steve Yasazawa, M.D.; S. Steve Yasazawa, M.D., P.C.; and John R. Young, M.D., Petitioners,

v.

PHICO INSURANCE COMPANY, a Pennsylvania corporation, Respondent.

No. 92SC530.

Supreme Court of Colorado, En Banc.

July 11, 1994.

Rehearing Denied Aug. 15, 1994.

McDermott, Hansen & Reilly, Gerald P. McDermott, William J. Hansen, Denver, for petitioners.

Wood, Ris & Hames, P.C., F. Michael Ludwig, Mary E. Kanan, Mary E. Gibbons, Dennis A. Hanson, Denver, for respondent.

Hall & Evans, Alan Epstein, Denver, for amicus curiae American Ins. Ass'n.

Catherine Sparkman, Denver, for amicus curiae Blue Cross and Blue Shield of CO and American Council Life Ins.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy

M. Tymkovich, Sol. Gen., Robert M. Howard, Sr. Asst. Atty. Gen., Regulatory Law Section, Denver, for amicus curiae CO Com'r of Ins.

Justice MULLARKEY delivered the Opinion of the Court.

The liability issues involved in this insurance contract and tort action brought by 105 doctors against PHICO Insurance Company (PHICO) were addressed by this court in *Ballow v. PHICO Insurance Co.*, 875 P.2d 1354 (Colo.1993) (*Ballow I*). In that case, we reversed the court of appeals, 841 P.2d 344 and held that PHICO breached its malpractice insurance contracts with the doctors, and engaged in fraudulent misrepresentations and in bad faith insurance practices when it did not renew the doctors' claims-made policies[1] and withdrew from the Colorado market. However, we retained jurisdiction over the case in order to decide in a separate opinion all damages issues raised by the parties. For the reasons set forth below, we now affirm the trial court's order regarding damages in part, and reverse in part. We return the case to the court of appeals with directions to remand the case to the trial court for further proceedings consistent with this opinion.

## I

In order to fully understand the damages issues raised by the parties in this case, we first must describe in detail all damages which were awarded by the trial court. Since the facts underlying this case are set forth fully in *Ballow I, id.*, 875 P.2d at 1357–59, we will discuss only those facts which directly pertain to the damages awarded in this case.

First, the trial court determined that PHICO breached its contract with the doctors by changing the percentage and method by which the cost of tail coverage[2] was calculated. As we explained in *Ballow I, id.*, 875 P.2d at 1358, PHICO's early policy endorsements provided that tail coverage would be available for 79 percent of the mature rate premium after one year of coverage with PHICO, 112 percent of the mature rate premium rate after two years of coverage, and 118 percent after the third and every subsequent year of coverage. PHICO then raised these rates on October 1, 1984 to 89 percent of the mature premium rate after one year, 134 percent after the second year, and 140 percent after the third and every subsequent year. Finally, as part of its April 1, 1986 premium increase, PHICO changed the date from which the tail premium was calculated from the premium in effect at the beginning of the last policy year, to the premium in effect·at the inception of the tail policy. Based upon these findings, the trial court awarded contract damages to the doctors in an amount equal to the difference between the bargained-for fourth-year mature rate (118 percent) and the actual tail rate imposed (140 percent).

The trial court then awarded the doctors damages on their tort claims. The trial court first awarded the full cost of the tail premium to those doctors who purchased tail coverage from PHICO. Although it is not entirely clear from the trial court's order, the award of free tail coverage apparently was based on the court's conclusion that PHICO told the doctors that they only would have to buy a tail policy once in their careers. For those doctors who elected not to purchase tail coverage from PHICO, or who obtained tail policies in an amount less than they were insured by PHICO, the trial court ordered PHICO to "specifically perform" the contracts by providing free tail coverage to the doctors. However, no free tail coverage or equivalent damages were awarded to those

---

1. As we explained in *Ballow I*, 875 P.2d at 1357, "claims-made" insurance is a type of professional liability insurance policy which provides coverage for claims made during the policy period, regardless of when the events out of which the claim arose occurred.

2. Insureds who purchase claims-made policies can protect themselves against claims made after the policy terminates by obtaining either "prior acts" or "tail" coverage. "Prior acts" coverage is purchased from a new insurer who charges an additional premium in order to cover the insured for acts occurring before the inception date of the new liability policy. Extended reporting period, or "tail," coverage is purchased from the first insurer and covers future claims made for incidents occurring during the time of the claims-made coverage. *Id.*, 875 P.2d at 1357–58.

doctors who purchased prior acts coverage from a subsequent insurance carrier, that is, a carrier other than PHICO.

In addition to the cost of the tail policy and/or specific performance, the trial court awarded the doctors the cost of paying into the surplus funds of post-PHICO carriers, such as the COPIC Trust,[3] as a prerequisite for purchasing new insurance from that carrier. It also awarded damages for the costs of financing tail coverage or surplus contributions, as well as damages for emotional distress.

Finally, punitive damages were awarded to twenty-nine of the doctors who had direct verbal contact with PHICO on, around or after May 15, 1986, concerning whether PHICO would stay in the Colorado market. Additionally, the trial court awarded prejudgment interest on all compensatory and punitive damages, and costs for expert witness fees and photocopying. Both PHICO and the doctors have raised various challenges to the damages awarded by the trial court, each of which we will address below.

## II

### Compensatory Damages

#### A

PHICO first argues that the trial court erred in awarding free tail coverage to those doctors who purchased tail coverage from PHICO. According to PHICO, this award results in an unjust economic windfall for the doctors since they did not bargain for free tail coverage. We agree.

 Compensatory damages are awarded in order to make the injured party whole.

Board of County Comm'rs v. Slovek, 723 P.2d 1309, 1314 (Colo.1986); Airborne, Inc. v. Denver Air Ctr., Inc., 832 P.2d 1086, 1091 (Colo.App.1992); Great Western Sugar Co. v. Pennant Products, Inc., 748 P.2d 1359, 1361 (Colo.App.1987), cert. denied (Feb. 1, 1988). In other words, "[w]here a legal injury is of an economic character, ... legal redress in the form of compensation should be equal to the injury." Department of Health v. Donahue, 690 P.2d 243, 250 (Colo.1984). The trial court, as trier of fact, has wide discretion in fixing the measure and amount of damages. Bigler v. Richards, 151 Colo. 325, 328, 377 P.2d 552, 553 (1963); Koontz v. Rosener, 787 P.2d 192, 196 (Colo.App.1989). However, a trial court's award of damages will be set aside if it creates an economic windfall disproportionate to the plaintiff's injury. Donahue, 690 P.2d at 250.

 Consistent with these principles, recovery in fraud is only allowed to the extent that the value of the contractual benefits conferred falls short of the value as represented,[4] plus any other damages naturally and proximately caused by the misrepresentation.[5] Western Cities Broadcasting, 849 P.2d at 48; Trimble v. City & County of Denver, 697 P.2d 716, 724 (Colo.1985); Restatement (Second) of Torts § 549 (1977) (concerning measure of damages for fraudulent misrepresentation); Dobbs, Remedies § 9.2, at 594–95 (same). Likewise, an insured suing under the tort of bad faith breach of an insurance contract is entitled to recover damages based upon traditional tort principles of compensation for injuries *actually* suffered, including emotional distress. Farmers Group, Inc. v. Trimble, 658 P.2d

---

3. When PHICO withdrew from the Colorado market, COPIC was the only other medical malpractice insurer in Colorado. COPIC was swamped with a "tidal wave" of applications following PHICO's announced withdrawal. Since COPIC lacked sufficient surplus and reserve capacity to be able to insure this influx of doctors, it required each doctor obtaining coverage from COPIC to make a nonrefundable "contribution," equal to the first year's premium, to the surplus of the COPIC Trust.

4. In contrast, damages recoverable for negligent misrepresentation include the difference between the value of what the plaintiff received and its purchase price or other value given for it (*i.e.*,

out-of-pocket expenses). Western Cities Broadcasting, Inc. v. Schueller, 849 P.2d 44, 49 (Colo. 1993).

5. Although the trial court awarded additional damages to the doctors for their tort claims, such award could not have been based on a difference between the measures of damages to be used in contract and tort actions for fraud involving a contract between the parties. The measure of damages in both cases is the "benefit of the bargain rule," designed to give the plaintiff his or her expectation interest for loss of bargain. Dan B. Dobbs, Remedies § 9.2., at 595 (1973).

1370, 1375 (Colo.App.1982), *aff'd*, 691 P.2d 1138 (Colo.1984).

■ As we noted above, the trial court did not clearly state why it decided to award the full cost of the tail premium as an item of tort damages. However, it appears that the trial court did so based on its conclusion that PHICO misrepresented the circumstances in which the doctors would be required to pay for a tail policy.[6] According to the trial court, (1) PHICO failed to inform the doctors that it could nonrenew their policies if it decided to leave the Colorado market for business reasons, and (2) affirmatively misrepresented the circumstances in which the doctors would be required to purchase a tail policy. We will address each of these findings in turn.

First, the trial court concluded that PHICO failed to tell the doctors that they would be obligated to purchase a tail policy if PHICO nonrenewed their claims-made policies for business reasons:

> Though it was understood that the insurer had some rights of non-renewal relating to non-payment of premium or the insured having too many claims paid on his/her behalf, it was never understood nor contemplated that the insurer had the right to non-renew for its own business opportunities or interests and that then the insured would be required to pay premiums for tail coverage.
>
> *If the defendant at any time believed that it had such absolute right of non-renewal, that right should have been clearly and unequivocally stated in its policy and brochures as well as in its oral sales presentations.* . . .

(Emphasis added). This analysis is erroneous as a matter of law.

■ Generally, unless there is a clause in the policy to the contrary, an insurer can nonrenew a policy for any reason. *Ballow I*, 875 P.2d at 1363; *see also Gahres v. PHICO Ins. Co.*, 672 F.Supp. 249, 253 (E.D.Va.1987) (no duty to renew medical malpractice insur-

ance); *Coira v. Florida Medical Ass'n, Inc.*, 429 So.2d 23, 23 (Fla.App.1983); 18 George J. Couch, *Cyclopedia of Insurance Law* § 68.12, at 15 (2d rev. ed. 1983) ("Where there is no clause in the policy expressly granting a privilege or imposing a duty of renewal, neither party has any right to require a renewal."). The insurer is not required to affirmatively set forth every circumstance which could precipitate the nonrenewal decision. Thus, PHICO cannot be held liable for misrepresentation simply because it failed to tell the doctors that it might decide to nonrenew their policies for business reasons.

Next, the trial court found that PHICO led the doctors to believe that they would only have to purchase a tail policy one time in their careers, at the time of their retirement or when the doctors voluntarily decided to change insurance companies. We hold that the trial court's conclusion is contrary to the evidence and resulted in a damage award grossly disproportionate to the legal injury sustained by the doctors. The award of free tail coverage cannot stand.

Although PHICO may not have told the doctors that a tail policy would be required should PHICO decide to leave the Colorado market, the doctors knew that they might need to purchase a tail policy more than once in their careers. The trial court specifically determined that the doctors knew that a tail policy was required when they chose to leave PHICO, either through retirement or by reason of change to another insurer. Many of the doctors had been in practice for years and had switched malpractice carriers during that time. Indeed, twenty-nine doctors had been insured with more than one carrier prior to PHICO and many doctors had purchased a tail policy or obtained prior acts coverage before insuring with PHICO. By the time of trial in 1989, ten doctors had been insured with more than one carrier *subsequent* to PHICO.

---

6. Apparently, this allegation was not contained in the doctors' contract claim. Instead, the trial court found that the doctors "limited [their] breach of contract claim to three specific aspects of the contract—the terms with respect to the

calculation of the tail, the retirement plan and the dividend plan." This may explain why the trial court did not award free tail coverage as an item of contract damages.

The trial court further found that "it was understood that the insurer had some rights of non-renewal relating to non-payment of premium or the insured having too many claims paid on his/her behalf." Moreover, PHICO informed the doctors that they would have to purchase tail coverage in the event that the policy was terminated by either the doctor or by PHICO. The cover page of PHICO's claims-made policy provided "[u]pon termination of this policy, in order to have coverage for incidents occurring during the policy period, but not reported as claims until after the date of termination, *you must purchase Reporting Period ("Tail") Coverage.*" (Emphasis added). Similarly, the policy application, expressly incorporated into the policy, stated:

> **TAIL COVERAGE OPTION:** I understand that if claims-made coverage is terminated at any time, tail (extended reporting period) coverage may be purchased and I must exercise such right by written notice no later than thirty (30) days after coverage termination.

PHICO's brochures also promised the availability of tail coverage for a "one-time" premium if coverage was "terminated for any reason." As the termination clause of the policy makes clear, both the insured and PHICO had the right to terminate the policy:

> **Termination.** *This policy may be terminated by the named insured* by written notice to the Company stating when thereafter the termination shall be effective. *The Company will not terminate this policy, except for suspension or revocation of the insured's license or approval to provide health care services or for nonpay-*

*ment of premium, unless notice of such termination shall have been given within sixty (60) days after the initial effective date of the insured's coverage or unless a written notice stating the reasons for the termination and the date and time upon which termination becomes effective has been mailed to the insured sixty (60) days prior to termination.*

(Emphasis added). Thus, there is no basis for the trial court's conclusion that PHICO led the doctors to believe that a tail policy must be purchased only if the *doctors* chose to leave the company.

PHICO could have nonrenewed or terminated the doctors' claims-made policies, necessitating the purchase of tail coverage by the doctors, even if it had fulfilled its promise to stay in the Colorado market. The doctors could have had no reasonable expectation to the contrary. An award of free tail coverage by the trial court placed the doctors in a more advantageous position than they would have been in had PHICO's misconduct never occurred. The award was erroneous and, accordingly, we reverse it.[7] We have not calculated what amount should have been awarded to each doctor who paid for tail coverage, but we direct the trial court on remand to award damages which reflect the extent of each doctor's injury caused by having to purchase a tail policy sooner than anticipated or at a higher rate than promised. The proper measure of damages is the difference between the cost of the tail coverage as originally contracted for by each doctor[8] and the amount actually paid for the coverage, plus any other damages proximately caused by PHICO's misconduct.[9]

7. Because we hold that the trial court erred in awarding the doctors free tail coverage, we need not address PHICO's contention that tail cost and surplus contributions must be offset against the savings the doctors enjoyed by virtue of insuring with subsequent carriers at first-year rates, rather than the mature level rate charged by PHICO. In its briefs, PHICO asked that we consider this argument only if the award of free tail coverage was affirmed.

8. Apparently, certain doctors did not have policies with the endorsement showing a tail premium rate of 118 percent because their claims-made coverage began after the tail premium rate had been raised in 1984 to 140 percent. On

remand, the trial court must recalculate the damages to be awarded to these doctors based on the correct tail premium rate.

9. For example, the trial court correctly awarded the doctors the cost of paying into the surplus funds of post-PHICO carriers, the cost of financing tail coverage or surplus contributions, and damages for emotional distress. We reject PHICO's argument that the emotional distress damages must be modified if the trial court modifies its compensatory damages award. There is no support in the record for PHICO's contention that the trial court calculated the doctors' emotional distress damages to be ten percent of the compensatory damages awards.

For similar reasons, we find that the trial court abused its discretion in awarding "specific performance" to those doctors who went without tail or prior acts coverage, or who obtained tail policies in amounts less than they were insured by PHICO. A decree of specific performance is designed to remedy a past breach of contract by fulfilling the legitimate expectations of the wronged promisee. *Snyder v. Sullivan,* 705 P.2d 510, 513 (Colo.1985); *Thurmon v. Skipton,* 157 Colo. 423, 431, 403 P.2d 211, 215 (1965); 5A *Corbin on Contracts* § 1138 (1964). However, specific performance can only be accomplished according to the terms of the parties' contract. *Cox v. Bertsch,* 730 P.2d 889, 892 (Colo.App.1986); *Otis Oil & Gas Corp. v. Maier,* 74 Wyo. 137, 284 P.2d 653, 656 (1955). A court may not make a contract for the parties and then order it to be specifically performed. *D.H. Overmyer Co. v. Brown,* 439 F.2d 926, 929 (10th Cir.1971); *Shull v. Sexton,* 154 Colo. 311, 316, 390 P.2d 313, 316 (1964); *Cox,* 730 P.2d at 892.

In the present case, specific performance would only have been an appropriate remedy if PHICO had promised the doctors that they would not have to pay for tail coverage in the event of nonrenewal. However, as discussed above, the evidence overwhelmingly supports the trial court's conclusion that the doctors knew that they could be nonrenewed by PHICO, and therefore could be required to purchase more than one tail policy during their careers. Accordingly, we reverse the judgment ordering specific performance as well.[10]

### B

The doctors argue that the trial court erred in failing to award the cost of prior acts coverage to those physicians who chose not to purchase tail coverage from PHICO. For the reasons set forth above, we conclude that these doctors are not entitled to the full cost of their prior acts coverage. However, we agree that they are entitled to compensatory damages for the difference in cost between the contractually-agreed-upon cost of PHICO's tail coverage, and the actual cost of the prior acts coverage from the subsequent insurer. As we explained in *Ballow I,* 875 P.2d at 1357–58, a prior acts policy is essentially tail coverage offered by the subsequent carrier. Therefore, the doctors who purchased prior acts coverage from another insurer should be compensated in the same fashion as those doctors who elected to purchase tail coverage from PHICO.

### C

The doctors also contend that the trial court erred in not awarding certain compensatory damages to five of the doctors.

First, the doctors argue that the trial court should have awarded the costs of defending and settling past malpractice claims to two doctors (Drs. Kandel and Taylor) who did not purchase prior acts or tail coverage. PHICO, on the other hand, contends that these doctors failed to mitigate their damages by purchasing tail coverage, and therefore are not entitled to recover damages for these claims. We disagree.

Generally, an injured party has the duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained. *Tull v. Gundersons, Inc.,* 709 P.2d 940, 946 (Colo. 1985); *Technical Computer Servs., Inc. v. Buckley,* 844 P.2d 1249, 1255 (Colo.App. 1992), *cert. denied* (Feb. 16, 1993). This means that the plaintiff may not recover damages for injuries which he or she reasonably might have avoided. *Valley Dev. Co. v. Weeks,* 147 Colo. 591, 596, 364 P.2d 730, 733 (1961). However, mitigation is an affirmative defense which the defendant has the burden of establishing. *First Nat'l Bank v. Gilbert Marshall & Co.,* 780 P.2d 73, 76 (Colo.App. 1989); *Mesa Sand & Gravel Co. v. Landfill, Inc.,* 759 P.2d 757, 760 (Colo.App.1988), *rev'd on other grounds,* 776 P.2d 362 (Colo.1989); CJI–Civ.3d 5:2.

---

**10.** On appeal, the doctors also argue that the trial court erred in failing to award the full amount the doctors paid as tail premiums as contract damages under the doctrine of reasonable expectations. Since we have concluded that the doctors were not entitled to the full cost of their tail coverage as damages, the trial court did not err in this regard.

■ In this case, the trial court expressly found that PHICO "did not argue and specifically abandoned upon the Court's questioning, the defense of mitigation of damage," and PHICO does not dispute this contention. Accordingly, these two doctors are entitled to the cost of defending and settling their past malpractice claims, less the cost of tail coverage (at the rate originally contracted for) which each doctor avoided by choosing not to purchase insurance. *See General Ins. Co. v. City of Colorado Springs,* 638 P.2d 752, 759 (Colo.1981) (defining measure of damages in a contract case to include any consequential damages caused by the breach, less any cost that the injured party has avoided by not having to perform); Restatement (Second) of Contracts § 347 (1981) (same).

■ Second, the doctors contend that the trial court should have awarded Dr. Sadler his loss of retirement benefits and the cost of his prior acts coverage. When Sadler first insured with PHICO in 1983, his claims-made policy provided that a doctor who had been insured continuously for four years with PHICO could retire at age 55 or older and only have to pay a tail premium equal to 100 percent of the premium for the last policy year. However, in 1986, PHICO changed the retirement age requirement to age 65. Sadler maintains that he planned to retire at 55, and qualified for PHICO's retirement plan when PHICO nonrenewed him effective in May 1987. Therefore, he requests contract damages for the difference between the amount of prior acts coverage which he purchased and the amount of the retirement tail which he should have been charged by PHICO, or tort damages for the total cost of his prior acts coverage.

For the reasons set forth *supra* in part IIB, we conclude that Dr. Sadler is not entitled to the full cost of his prior acts coverage. He only should receive damages for the difference between the cost of the tail coverage he originally contracted for and the cost of the prior acts coverage which he purchased. However, this calculation should not be based on the cost of the retirement tail (100 percent of the last year premium) contained in Sadler's policy. As the trial court found, none of the doctors testified that he or she tried to retire after paying a 100 percent tail and was refused that option. Rather, PHICO accommodated other Colorado physicians who retired simultaneously with PHICO's withdrawal and provided tail policies to these doctors at 100 percent of the mature rate in effect during the last policy period. Dr. Sadler, on the other hand, never asked PHICO about the cost of tail coverage so that he could retire, and did not testify that he had any intentions of retiring in 1987. In fact, Dr. Sadler apparently continues to practice medicine today. Accordingly, he is not entitled to additional damages for PHICO's alleged denial of his retirement benefits.

Third, the doctors argue that the trial court erred in failing to award specific performance to Dr. Press, who had no tail or prior acts coverage for the period between October 4, 1984 and October 4, 1987. Because we reverse the award of specific performance to all doctors, *see supra* part IIA, we find Dr. Press's claim to be without merit.

■ Finally, the doctors contend that the trial court should have awarded damages to Dr. Melmed, who switched to PHICO from COPIC in September 1983 due to PHICO's promises of extremely low occurrence rates. When PHICO discontinued its occurrence policies in September 1985, Melmed returned to COPIC. However, he was required to start over to qualify for COPIC's preferred risk program entitling him to a fifteen-percent reduction in COPIC premiums. He is asking for damages for the loss of continuity of coverage allegedly caused by PHICO's misconduct.

The record supports the trial court's decision not to award Dr. Melmed any damages. Melmed testified that he switched to PHICO for economic reasons, and he in fact realized large cash savings as a PHICO insured. Accordingly, we affirm the trial court's order with respect to Dr. Melmed.

### III

### *Punitive Damages*

Both parties dispute the trial court's decision concerning which doctors were entitled to punitive damages. PHICO contends that

the trial court erred in awarding punitive damages to thirteen of the doctors, whereas the doctors defend those awards and argue that the trial court should have awarded punitive damages to additional doctors, *i.e.*, those doctors who were engaged in group practice with the recipients of PHICO's misrepresentations.

■■■ In Colorado, punitive damages are available only pursuant to statute, *Gruntmeir v. Mayrath Industries, Inc.*, 841 F.2d 1037, 1040 (10th Cir.1988); *Kaitz v. District Court*, 650 P.2d 553, 556 (Colo.1982), and are not recoverable in ordinary breach of contract cases. *Mortgage Finance, Inc. v. Podleski*, 742 P.2d 900 (Colo.1987); *Williams v. Speedster, Inc.*, 175 Colo. 73, 485 P.2d 728 (1971). However, they may be awarded on a claim of bad faith breach of an insurance contract, so long as the breach is accompanied by circumstances of "fraud, malice, or willful and wanton conduct," section 13–21–102, 6A C.R.S. (1987). *South Park Aggregates, Inc. v. Northwestern Nat'l Ins. Co.*, 847 P.2d 218, 224 (Colo.App.1992); *Farmers Group, Inc. v. Trimble*, 768 P.2d 1243, 1247 (Colo.App.), *cert. dismissed* (Nov. 18, 1988).

■■■ A plaintiff cannot receive punitive damages unless all of the statutory elements have been established beyond a reasonable doubt. § 13–25–127(2), 6A C.R.S. (1987). And, even if the plaintiff has established that punitive damages are permissible, a punitive damages award remains at the discretion of the trier of fact. *Seaward Constr. Co., Inc. v. Bradley*, 817 P.2d 971, 975 (Colo.1991); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 427 (Colo.1991); *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 49 (Colo. App.1987). This decision will not be disturbed on appeal absent a clear abuse of discretion. *Leo Payne Pontiac, Inc. v. Ratliff*, 178 Colo. 361, 365, 497 P.2d 997, 999 (1972).

■■ In the present case, the trial court stated that it would award punitive damages only to those doctors "who had direct verbal contact with PHICO on, around or after May 15, 1986 as to whether PHICO would stay in the market." The court chose May 15, 1986 as the cut-off date because this was when PHICO's president's committee convened to decide the fate of the individual physician medical malpractice policies. If the doctors inquired about PHICO remaining in Colorado after this date then, the trial court found, any responsive comments to the contrary were attended by circumstances of "fraud, malice, insult and wanton and reckless disregard of the plaintiffs' [rights] or alternatively were willful and wanton."

A review of the record reveals that many of the twenty-nine doctors awarded punitive damages did not prove beyond a reasonable doubt that they were entitled to punitive damages under the standards set by the trial court. For example, some of the doctors had direct verbal contact with PHICO after May 15, 1986, but there was either insufficient proof concerning the substance of the conversations (as in the case of Drs. Chisolm and Shields), or the discussions with PHICO concerned other subjects (as in the cases of Drs. Hartman, Henry and Victor).[11] One doctor (Dr. Harris) who received punitive damages testified that he had no conversations with PHICO prior to renewing his policy in 1986. In addition, another doctor (Dr. Wolf) contacted PHICO concerning its decision to remain in the state, but these conversations took place in February and March 1986, rather than on, around or after May 15, 1986. Accordingly, we hold that the award of punitive damages to these seven doctors must be reversed.[12]

We also conclude that the trial court abused its discretion in not awarding punitive damages to two doctors (Drs. Jacobs and

---

11. With respect to these doctors, it is true that PHICO failed to disclose its intention to leave the state, and concealment constitutes "fraud" within the meaning of the punitive damages statute. *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 215 n. 8 (Colo.1984). However, the. doctors do not challenge the trial court's decision to award punitive damages only to those physicians who received affirmative misrepresentations, as op-

posed to those from whom PHICO merely concealed its plans.

12. We find that the punitive damages awards received by Drs. Kandel, Rifkin, Schneebaum, Kesler, Ludwin and Donnelly are supported sufficiently by the evidence.

Jeffrey) who were engaged in group practice with the recipients of PHICO's fraudulent misrepresentations. Many of the doctors who were awarded punitive damages were engaged in group practice, in the form of either a partnership or a professional corporation. As with any group practice, an office manager or one of the partners was responsible for insurance matters, while the other doctors would rely on this individual when deciding whether the group should renew.

The trial court awarded punitive damages to the individual doctor in the group who contacted PHICO or its agents and who directly received reassurances concerning PHICO's intention to remain in the Colorado market. However, it then inconsistently awarded punitive damages to only some of the other group members who relied on that same false reassurance. For example, Arvada Pediatric Associates, P.C., consisted of Drs. Kessel, Schneebaum, Weiss and Jacobs. As senior member of the group, Dr. Kessel conducted the business activity for the group, had direct contact with PHICO, and the other doctors in the group relied upon his advice. While Drs. Kessel, Schneebaum and Weiss were awarded punitive damages, Dr. Jacobs was not.

Similarly, the Fort Collins Women's Clinic, P.C., was comprised of Drs. Kesler, Donnelly, Ludwin and Jeffrey. Both the office administrator and Dr. Kesler were assured by PHICO that there was no intent to leave the state, and Dr. Jeffrey relied on his partners for information concerning insurance. However, while the other doctors in the group were awarded punitive damages, Dr. Jeffrey was not. In our opinion, even though the trial court had discretion whether to award punitive damages to the doctors in the first instance, it abused that discretion when it arbitrarily and inconsistently meted out punitive damages among a group of similarly situated physicians. Accordingly, we direct the trial court to award punitive damages to Drs. Jacobs and Jeffrey on remand.[13]

13. The doctors also argue that Drs. O'Loughlin and Mestas should have received punitive damages since they were in partnership with Dr. Henry. Since we hold that the trial court erred in awarding punitive damages to Dr. Henry, *see supra* at 682, his partners cannot receive punitive damages based on this award.

## IV

### *Prejudgment Interest*

#### A

■ PHICO contends that the trial court erred in awarding prejudgment interest on punitive damages, and we agree. Prejudgment interest is not allowed on punitive damages. *Lira v. Davis*, 832 P.2d 240, 246 (Colo. 1992); *Bradley*, 817 P.2d at 979. Thus, the trial court's award of prejudgment interest on punitive damages was in error and must be reversed.

#### B

■ PHICO also maintains that the district court erred in awarding the doctors prejudgment interest on nonpunitive damages at a rate of 9.4 percent, as opposed to the statutory rate of eight percent. Again, we agree.

In cases other than "actions brought to recover damages for personal injuries" under section 13–21–101, 6A C.R.S. (1987), a prevailing party may recover prejudgment interest under section 5–12–102, 2 C.R.S. (1992). *Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362, 363 (Colo.1989). This statute allows a court to award interest in "an amount which fully recognizes the gain or benefit realized by the person withholding such money," section 5–12–102(1)(a), or at the statutory rate of eight percent per annum compounded annually, section 5–12–102(1)(b). In the absence of any proof as to the defendant's gain, the statutory rate of interest applies. *Lowell Staats Mining Co., Inc. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1270 (10th Cir.1989); *Bankers Trust Co. v. International Trust Co.*, 108 Colo. 15, 35, 113 P.2d 656, 665 (1941); *E.B. Jones Constr. Co. v. City & County of Denver*, 717 P.2d 1009, 1015 (Colo.App.1986).

Here, the trial court awarded interest to the doctors at a rate of 9.4 percent, the United States Treasury rate at the time of trial. However, there is no evidence in the record to support this interest rate as the

gain or benefit realized by PHICO. As PHICO points out, the only use of that rate at trial was in calculating present values of premiums paid for the purpose of comparison with PHICO's competitors. Moreover, the doctors' expert testified that the 9.4 percent interest rate was the treasury rate in April 1989, and this rate had risen significantly from eight to 9.4 percent in the six months immediately preceding the trial. Since the record is devoid of any evidence of PHICO's gain or benefit, the doctors are only entitled to interest at the statutory rate of eight percent per annum compounded annually.

## C

PHICO also argues that the trial court erred in awarding prejudgment interest commencing November 1, 1986—the date on which PHICO began nonrenewing independent physicians in Colorado. According to PHICO, no money or property was "wrongfully withheld" within the meaning of section 5–12–102(1)(b), 2 C.R.S. (1992), until each doctor actually paid a tail premium to PHICO or to the surplus of COPIC. This argument is not persuasive.

■ Section 5–12–102(1)(b) is to be liberally construed to permit recovery of prejudgment interest on money or property wrongfully withheld. *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1122 (Colo. 1990); *Britvar v. Schainuck*, 791 P.2d 1183, 1185 (Colo.App.1989), *cert. denied* (June 11, 1990). Thus, one who is damaged by a breach of contract is entitled to recover prejudgment interest of eight percent annually from the time of the breach. *Mesa Sand & Gravel*, 776 P.2d at 365; *see also Wall v. Foster Petroleum Corp.*, 791 P.2d 1148, 1151 (Colo.App.1989) (stating that a plaintiff is entitled to interest from the time his cause of action accrues), *cert. denied* (May 14, 1990).

■ In this case, the trial court expressly found that PHICO breached its contracts with the doctors by changing the percentage and method by which the tail policy was calculated. These policy changes were made in both October 1984 and April 1986. Accordingly, while the trial court could have used an earlier date, it did not err in choosing November 1, 1986 as the commencement date for the running of prejudgment interest.

## V

### Costs

Finally, PHICO claims that the trial court erred in awarding $5,691.82 in photocopying costs and $41,452.85 in expert witness fees to the doctors. According to PHICO, the photocopying expenses are unwarranted, and the expert witness fees are excessive, unreasonable and unsubstantiated. We disagree with both of these contentions.

■ On December 4, 1989, the trial court entered an order awarding costs, finding fees for photocopies to be specifically authorized by section 13–16–122(1)(f), 6A C.R.S. (1987). With regard to the expert witness fees, the trial court made the following findings:

Finally, the Court awards costs for the testimony and trial preparation fees for various experts pursuant to C.R.S. § 13–16–102(1)(e) and § 13–33–102(4). Defendant objects to the taxing of costs for certain of these experts, alleging that even if the costs are legally permissible in the discretion of the Court, the costs are excessive due to errors and waste on behalf of Plaintiffs, referring especially to the work performed by the accountant Gardenschwartz and the actuary Lowe. *The Court finds that these costs are not inflated due to waste or error, but are reasonable in light of the complexity of this case.*

(Emphasis added).

■ Generally, the awarding of costs is within the sound discretion of the trial court, and will not be reversed on appeal absent a clear abuse of discretion. *Ferrell v. Glenwood Brokers, Ltd.*, 848 P.2d 936, 940 (Colo. 1993); *Rossmiller v. Romero*, 625 P.2d 1029, 1030 (Colo.1981); *Church v. American Standard Ins. Co.*, 764 P.2d 405, 406 (Colo.App. 1988). In our opinion, the trial court did not abuse its discretion in awarding costs to the doctors for photocopying expenses and expert witness fees. Therefore, the award will not be disturbed.

## VI

In summary, we hold that the trial court employed an erroneous measure of damages when it awarded free tail coverage and/or specific performance to the doctors. On remand, the proper measure of damages is the difference between the cost of tail coverage originally contracted for by each doctor and the amount actually paid for the coverage, plus any other damages proximately caused by PHICO's misconduct. The doctors who purchased prior acts coverage should be similarly compensated. We further hold that the trial court's award of punitive damages is reversed as to seven doctors who are not entitled to punitive damages, and as to two doctors who qualify for punitive damages under the criteria established by the trial court.[14] Additionally, the trial court's award of prejudgment interest on punitive damages is reversed, and the trial court is directed to compute prejudgment interest on nonpunitive damages at the statutory rate of eight percent per annum compounded annually. The trial court's order is affirmed in all other respects.

The case is returned to the court of appeals with directions to remand it to the trial court for further proceedings consistent with this opinion.

14. Since the trial court awarded punitive damages in an amount equal to each doctor's actual damages, all punitive damages awards will have to be modified to reflect any change in the compensatory damages awards resulting from this opinion.